## STEVENSON *v.* UNITED STATES.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
EASTERN DISTRICT OF TEXAS.

No. 681.  Argued March 9, 1896. — Decided April 18, 1896.

On the trial of a person indicted for murder, although the evidence may appear to the court to be simply overwhelming to show that the killing was in fact murder, and not manslaughter or an act performed in self defence, yet, so long as there is evidence relevant to the issue of manslaughter, its credibility and force are for the jury, and cannot be matter of law for the decision of the court.

A review of the evidence at the trial of the defendant (plaintiff in error) in the court below shows that there was error in the refusal of the court of the request of the defendant's counsel to submit the question of manslaughter to the jury.

THE case is stated in the opinion.

*Mr. Fred Beall* for plaintiff in error. *Mr. Joseph P. Mullen* filed a brief for same.

*Mr. Assistant Attorney General Dickinson* for defendants in error.

MR. JUSTICE PECKHAM delivered the opinion of the court.

The plaintiff in error was indicted in the United States Circuit Court for the Eastern District of Texas, at the term commencing on the 20th of November, 1893. The indictment charged the defendant with the crime of murder in killing one Joe Gaines on the 22d of August, 1893, in Pickens County, in the Chickasaw Nation, in the Indian Territory, the same being annexed to and constituting a part of the Fifth Circuit, and annexed to and constituting a part of the Eastern District of Texas for judicial purposes. The defendant was tried at the Circuit Court held for the Eastern District of Texas in April, 1895, and was convicted by the jury of murder, as charged in the indictment, and sentenced to be hanged. He then sued out a writ of error from this court. It will be necessary to notice but one exception taken by counsel for the plaintiff in error upon the trial. After the evidence was in, he requested the court to submit to the jury a charge upon manslaughter, " but the court refused to submit that issue to the jury, to which action of the court in failing and refusing to submit to the jury such charge, the defendant at the time excepted."

The question is whether the court erred in refusing this request. The evidence as to manslaughter need not be uncontradicted or in any way conclusive upon the question; so long as there is some evidence upon the subject, the proper weight to be given it is for the jury to determine. If there were any evidence which tended to show such a state of facts as might bring the crime within the grade of manslaughter, it then became a proper question for the jury to say whether the evidence were true and whether it showed that the crime was manslaughter instead of murder. It is difficult to think of a case of killing by shooting, where both men were armed and both in readiness to shoot, and where both did shoot, that the question would not arise for the jury to answer, whether

the killing was murder or manslaughter, or a pure act of self defence.  The evidence might appear to the court to be simply overwhelming to show that the killing was in fact murder, and not manslaughter or an act performed in self defence, and yet, so long as there was some evidence relevant to the issue of manslaughter, the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court.

By section 1035 of the Revised Statutes of the United States it is enacted that " in all criminal causes the defendant may be found guilty of any offence, the commission of which is necessarily included in that with which he is charged in the indictment, or may be found guilty of an attempt to commit the offence so charged : *Provided,* That each attempt be itself a separate offence."   Under this statute the defendant charged in the indictment with the crime of murder may be found guilty of the lower grade of crime, viz., manslaughter. There must, of course, be some evidence which tends to bear upon that issue.  The jury would not be justified in finding a verdict of manslaughter if there were no evidence upon which to base such a finding, and in that event the court would have the right to instruct the jury to that effect. *Sparf* v. *United States,* 156 U. S. 51.

The ruling of the learned judge was to the effect that, in this case, the killing was either murder, or else it was done in the course of self defence, and that under no view which could possibly be taken of the evidence would the jury be at liberty to find the defendant guilty of manslaughter.  The court passed upon the strength, credibility and tendency of the evidence, and decided as a matter of law what it seems to us would generally be regarded as a question of fact, viz., whether under all the circumstances which the jury might, from the evidence, find existed in the case, the defendant was guilty of murder, or whether he killed the deceased, not in self defence, but unlawfully and unjustly, although without malice.  The presence or absence of malice would be the material consideration in the case, provided the jury should reject the theory of self defence, and yet this question of fact

is, under the evidence in the case, determined by the trial court as one of law and against the defendant.

A review of some of the evidence stated in the bill of exceptions is necessary in order to discover whether there was justification for this holding by the learned judge. It may be premised that we do not give very much of the evidence tending to show malice in the defendant and that which tended to show an intentional and deliberate murder of the deceased by him. We give only so much of the evidence as is necessary to permit an intelligent view of the transaction and of that portion of the evidence in addition which might be regarded as tending to show that the defendant was only guilty of manslaughter and not of murder. If there were some appreciable evidence upon that subject, its proper weight and credibility were for the jury.

There was evidence tending to show the following facts: The deceased was a deputy United States marshal. One B. D. Davidson was a lawyer by profession and a commissioner of the United States for one of the territorial courts. On the 22d of August, 1893, Davidson was at Paul's Valley in the Indian Territory. He knew the defendant, and he was also acquainted with Joe Gaines, the deceased. Davidson saw the defendant in the evening of that day at his (Davidson's) hotel. A man named George Mitchell had been bound over by Davidson, and had failed to give a proper bond, and Mitchell came to him and asked if he would take John Stevenson, the plaintiff in error, on the bond. Davidson told him he would if Stevenson could justify. Mitchell left, and soon thereafter brought Stevenson around, who told Davidson he had some personal property — he didn't know what it was exactly — but it did not amount to $500 above exemptions and liabilities. Davidson told him he would have to schedule other property, and plaintiff in error thought he ought to take a farm he had, and did not like Davidson's refusal, and went off. That same night, after supper and about 9 o'clock, while Davidson was talking with other persons, plaintiff in error came to the door and commenced cursing and abusing Davidson, saying, as Davidson testified, "everything he could put

his tongue to." Stevenson left, still cursing, and went south, and he could be heard as he went away cursing and swearing. Gaines, the deceased, soon thereafter came in the room in the hotel where Davidson was and asked what all "this racket or fuss was about." Davidson told him, and Gaines said, "I will go and arrest him and stop him;" he said he "would arrest him and hold him until morning," and went out for that purpose. Davidson heard some loud talking on the street soon after, and went out of his house and saw Gaines and Stevenson and a lady, whom he was told was Stevenson's wife, standing on the platform in front of the hotel talking, and Davidson passed by them and went on; he returned to the hotel soon after this, and in about a half hour he heard two shots fired, and Gaines, the deceased, got up and walked across to the north side of the room where he and Davidson were sitting, and picked up his pistol from a sewing machine, where he always kept it, and said he would go and "get him and fasten him, and keep him in charge and not release him any more." He then walked out of the house, and in about two minutes two shots were heard. Davidson then started to go, and some one prevented him; he soon afterwards saw Gaines, the deceased, when brought to the hotel dead; he had two wounds, one in his arm, the other in the breast; his coat sleeve had the appearance of being powder burned. This is the substance of Davidson's evidence.

Another witness says that soon after Gaines left Davidson's room for the purpose of arresting Stevenson, he (Gaines) and the plaintiff in error were seen together; it was about 9 o'clock, after dark; they were standing on the sidewalk back of Underwood's drug store; when the witness first heard Stevenson speak the latter said, "Don't draw that pistol; if you do I will cut you." Stevenson and the deceased were standing on the sidewalk then; the witness walked into the middle of the street and said to Stevenson, "John, put up your knife and go home and behave yourself." They then walked over to where the witness was, Stevenson holding with his left hand to Gaines' right arm; Stevenson was holding a knife in his right hand; after they came over to

where witness was, "Stevenson turned the officer loose, and as soon as he turned loose of Mr. Gaines and started off Gaines drew his pistol on him, and told Stevenson to drop his knife or he would kill him; he walked a step or two towards Gaines." Witness said: "John, for God's sake throw your knife down or he will kill you. Stevenson dropped his knife and Gaines told me (the witness) to take hold of him; I picked up the knife, and then took hold of him; Gaines and defendant kept quarrelling; Gaines said, 'John, I am determined to take you;' and Stevenson said, 'All right, I will go with you.'" They went along quietly, and witness went back to the drug store; he was there some ten or fifteen minutes, and saw Stevenson and his wife go back down the street from the direction of the hotel, and heard defendant say, "Smith, give me your gun." Smith told him he did not have any. Stevenson said, "I will go home and get my Winchester and come back and I will make the son of a bitch hide out." In about thirty minutes after this the witness heard two shots in quick succession at the billiard hall; he opened the barber shop door and saw Gaines lying in the street flat on his back; he gasped once after witness got to him and died. This witness says that at the time "Gaines threw his pistol down on Stevenson," at the interview had just before they separated and shortly before the killing, "Stevenson had turned and was walking off from Gaines, and while Stevenson had hold of the officer I heard him say to the officer, 'Don't draw that gun, or I will cut you.'"

Immediately after the first altercation had taken place between the parties, and they had separated, the plaintiff in error went into a saloon and called for cider, and wanted everybody to come up and drink; he made a general invitation. At that time he seemed, as the witness described it, "to be excited and mad." He had his gun in several positions, and just before the killing had it in his right hand. This was within a very few minutes after the first altercation took place. While the plaintiff in error was still in the saloon, and after he had given a general invitation to come up and

drink the cider, and while standing near the counter, the deceased, in the language of one witness, "approached the cider joint; he was coming very rapidly; as he ran up to the light he had his six shooter in both hands in shooting position; he ran right up to the door without saying a word, pushed the six shooter in, and fired; he fired instantly; he did not halt a moment; he did not say a word. Immediately after this I heard a report from the inside of the house; the two shots were far enough apart that I could distinguish between them; Gaines fired the first shot; I think the wound in Gaines' arm was made when he had the pistol in both hands; don't see how it could have been done otherwise."

Another witness testified, "The ball from Gaines' pistol imbedded in the counter, missing Stevenson five or six inches."

The testimony of another witness was as follows: "I was in Paul's Valley the night of the shooting; I saw the deceased at the Underwood drug store about half an hour before the killing; deceased said, 'I thought I would stay a few minutes and maybe Stevenson will come back;' he says, 'I ought to have killed the son of a bitch when he was here awhile ago, and if he comes back I am going to kill him.' I was at Bandy's saloon; saw the deceased as he approached; saw one shot fired; deceased came not in a run but in a kind of trot, with his pistol in both hands; as he approached the door in a trot he threw his pistol in and fired; he said nothing; I did not see where the defendant was standing at the time of the shooting; he had ordered cider just a moment before; I heard two shots close together; the first came from the pistol; after that another shot from the inside."

This is a portion of, but not all, the evidence given upon the trial tending to show the circumstances under which the killing was done. Was there enough, in any view that could be taken of such evidence, to require the submission of the question of manslaughter to a jury? We think there was, and the request of counsel for plaintiff in error to submit that issue to the jury should have been granted. We do not mean to intimate an opinion as to what the jury ought to find upon

such evidence, taken in connection with all the other evidence in the case, but it seems to us entirely clear that there was enough to ask the jury to decide whether the killing was, upon all the evidence in the case, murder or manslaughter. The jury should have been permitted to determine the credibility of the evidence, as above detailed, and, if true, whether the effect of the conduct of the deceased in shooting, as he did, into the saloon, and considering all the circumstances of the case, was such as naturally tended to and did excite in the mind of the plaintiff in error a sudden passion, either of rage or fear, and under the influence of which he fired the shot and killed the deceased wilfully and unlawfully, but at the same time without malice. If he thus fired the pistol, would not a jury have the right to say that the consequent killing was manslaughter instead of murder? Is it not clearly a question of fact for a jury to determine just what the mental condition of plaintiff in error was in regard to malice?

Manslaughter at common law was defined to be the unlawful and felonious killing of another without any malice, either express or implied. (Wharton's American Criminal Law, 8th ed. § 304.) Whether there be what is termed express malice or only implied malice, the proof to show either is of the same nature, viz., the circumstances leading up to and surrounding the killing. The definition of the crime given by § 5341 of the Revised Statutes of the United States is substantially the same. The proof of homicide, as necessarily involving malice, must show the facts under which the killing was effected, and from the whole facts and circumstances surrounding the killing the jury infers malice or its absence. Malice in connection with the crime of killing is but another name for a certain condition of a man's heart or mind, and as no one can look into the heart or mind of another, the only way to decide upon its condition at the time of a killing is to infer it from the surrounding facts, and that inference is one of fact for a jury. The presence or absence of this malice or mental condition marks the boundary which separates the two crimes of murder and manslaughter. As we have already said, there may be a case of killing by shooting where the

facts necessarily show malice, but, taking all the evidence in this case, we think it was one for the jury to determine upon the issue of manslaughter.

In *Brown* v. *United States*, 159 U. S. 100, Mr. Justice Harlan, when speaking of an affray in which the plaintiff in error was charged with having murdered a man, stated that "the verdict of guilty of manslaughter or murder should not have turned alone upon an inquiry as to the way in which the killing was done. The inquiry rather should have been, whether at the moment the defendant shot there were present such circumstances, taking all of them into consideration, including the mode of killing, as made the taking of the life of the deceased manslaughter and not murder." Who is to make the inquiry, the court or the jury under proper instructions from the court? There might be cases where the uncontradicted evidence was so clear and overwhelming of a deliberate purpose, involving malice, that a court might be justified in stating to the jury if they found the evidence to be true, they ought to infer malice; but this is not such a case.

In this case, the plaintiff in error was fresh from an altercation with the deceased, the one having a knife and the other a pistol, and each had threatened to use his weapon upon the other. The plaintiff in error, by reason of the previous circumstances, was laboring under great excitement at the saloon, and, as one of the witnesses says, "seemed to be mad." The deceased came up to the saloon door and at once shot his pistol into the room, and the bullet came within a few inches of the head of the plaintiff in error, who immediately fired his rifle in the direction of the deceased. The ruling of the trial judge in effect was to say that as matter of law there was nothing in all this evidence, if true, which would permit the jury to find that the plaintiff in error when he fired his rifle was so much under the influence of sudden passion, caused by these circumstances and by this assault upon him, as not to have been actuated by that malice which the law defines as a necessary ingredient in the crime of murder. Is it perfectly plain and clear, *as a conclusion of law*, that shooting at another under circumstances such as were detailed by

some of the witnesses in this case can have no tendency to raise within the mind of the person thus assaulted such a sudden passion of anger or terror as to deprive his subsequent act of that malice which is necessary to make it murder? If it is not to be so asserted as matter of law, then it becomes a question of fact in such case, and that question must be answered by the jury. Whether the witnesses told the truth in regard to such circumstances is not for the court to say, nor is it for the court to decide upon the weight to be given to them if proper for the consideration of the jury.

It is objected that while the evidence above set forth was proper to be submitted to the jury upon the issue of self defence, it was not of that character to even raise an issue as to the grade of the crime, if the theory of self defence were not sustained. We do not see the force of the objection. The fact that the evidence might raise an issue as to whether any crime at all was committed is not in the least inconsistent with a claim that it also raised an issue as to whether or not the plaintiff in error was guilty of manslaughter instead of murder. It might be argued to the jury, under both aspects, as an act of self defence and also as one resulting from a sudden passion and without malice. The jury might reject the theory of self defence, as they might say the shot from the pistol of the deceased had already been fired and the plaintiff in error had not been harmed, and, therefore, firing back was unnecessary and was not an act of self defence. But why should the other issue be taken from the jury and they not be permitted to pass upon it as upon a question of fact?

It seems to us quite plain, that an assault upon another by means of firing a pistol at him, is naturally calculated to excite some kind of passion in the one upon whom such an assault is made. It might be one of anger or it might be terror. If either existed to a sufficient extent to render the mind of a person of ordinary temper incapable of cool reflection, it might be plausibly claimed that the act which followed such an assault was not accompanied by the malice necessary to constitute the killing murder. Whether such a state of mind existed in this case, and whether the plaintiff in error fired the

shot under the influence of passion and without malice, cannot be properly regarded as a question of law.

A judge may be entirely satisfied from the whole evidence in the case that the person doing the killing was actuated by malice; that he was not in any such passion as to lower the grade of the crime from murder to manslaughter by reason of any absence of malice; and yet if there be any evidence fairly tending to bear upon the issue of manslaughter, it is the province of the jury to determine from all the evidence what the condition of mind was, and to say whether the crime was murder or manslaughter.

It is also objected that as all the testimony is not set forth in the bill of exceptions, it must be assumed there was some which was given on the trial that would show there was no issue of manslaughter in the case. The evidence which has been returned does, in our opinion, show the existence of such an issue, and if there were other and further evidence of a different nature, which is not in the bill of exceptions, the question as to which should be credited was for the jury, and should not have been taken from it by the court. The plaintiff in error may have been guilty of murder, there was certainly sufficient evidence on that issue to render it necessary to submit it to the jury. We have no power and no inclination to pass upon that question of fact. We only decide that the question as to the grade of the crime, whether murder or manslaughter, should have been submitted to the jury as well as the question of self defence.

For the error in refusing to do so, the judgment of conviction must be

*Reversed, and the cause remanded to the court below with instructions to grant a new trial.*