THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* NARCISO GALARZA RODRÍGUEZ, Defendant and Appellant.

No. 14421.    Argued June 1, 1950.—Decided June 14, 1950.

*Fernando Pérez Regis* for appellant. *Vicente Géigel Polanco, Attorney General,* and *Frank Vizcarrondo Vivas, Assistant Fiscal of the Supreme Court,* for appellee.

MR. JUSTICE MARRERO delivered the opinion of the Court.

Narciso Galarza Rodríguez appealed to this Court from a judgment sentencing him to life imprisonment at hard labor. He alleges that the District Court of Ponce committed eighteen errors during the trial. Because of some of the reasons alleged, the *Fiscal* consents to the reversal sought.

The evidence of the People tended to show that while

Pascual Castro Montalvo was in a ward of the municipal hospital of Yauco, in a comatose condition, the defendant entered and deliberately and with premeditation stabbed him seven times, as a result of which Castro Montalvo died. The evidence of the defense was to the effect that the defendant, who was a chauffeur of a public-service automobile had two minor sisters, orphans, who depended entirely on him and whom he worshipped; that one of them, though married, was separated from her husband, and that the other was unmarried and feeble-minded, both residing with him in a small frame house in Las Palomas Ward, Susúa Abajo place, in Yauco; that on September 5, 1947 while several workers repaired the porch of the aforesaid defendant's house, the deceased, who had a very bad reputation, secretly entered the house through the back door around 3:30 in the afternoon, and when he encountered the two sisters he threw Ana, the single one, on a bed and tried to rape her, taking out a knife at the same time and threatening them; that her sister Cruz, the married one, struggled with Castro Montalvo and the latter wounded the forefinger of her right hand, fracturing it; that Cruz screamed and that when Leonardo Ramírez, one of the men who at the time worked as assistant carpenter in the porch of the house, heard the screams, he ran into the house and upon seeing Cruz wounded and realizing the situation, he dealt Castro Montalvo a blow on his head with a crow bar (the aggressor called it so) which he was carrying; that the girls fled and Castro Montalvo followed them for a short while; that Leonardo Ramírez left immediately for town to inform the police of the incident; that shortly thereafter Castro Montalvo, who was found unconscious, in a squatting position and with his head between his legs, was taken to the municipal hospital, and that a knife of some length, was found near him and later at the hospital another knife was found on him; that about forty minutes or an hour later the defendant, who was carrying some groceries for his sisters, arrived at his home and was surprised to see so many people

in the surroundings; that when he entered the house he saw a pool of blood in the living room and when he asked what was the matter and was informed that Castro Montalvo had tried to rape his sisters, he began to weep; that he asked about them and when they told him that one of them was wounded and had gone to the hospital to be taken care of, he left immediately to see how she was; that he was carrying a knife which he found once in his car and which he used to repair the tires; that when he arrived at the hospital looking for his sister he saw Castro Montalvo lying in one of the beds and all of a sudden he felt the impulse of killing him, and stabbed him several times.

With this evidence, the jury that heard the case rendered a verdict of guilty of murder in the first degree and the court, as we said before, sentenced the defendant to life imprisonment.

■■ The theory of the prosecution was that it was a premeditated and deliberate murder. The theory of the defense was that when the defendant stabbed Castro Montalvo he had already died as a consequence of the blow dealt by Leonardo Ramírez, which caused him an intense intracranial hemorrhage and the fracture of the skull, and that proof that he was already dead was the fact that when they tried to apply serum to Castro Montalvo while in a comatose condition, it did not flow. The defense also maintained that the wounds inflicted on the deceased by the defendant were due to a sudden heat of passion when he came unexpectedly upon the man who shortly before had tried to rape his sisters.

During the trial the defense tried insistently and repeatedly to bring evidence tending to prove not only that defendant's parents had died insane and that the deceased had a bad reputation but also that a person of little education like the defendant when confronted with a situation like that, upon meeting the minors' aggressor, suffered a violent reaction and under the heat of passion attacked the deceased with the knife.

Most of the errors assigned are directed to the conduct of the court during the trial, that is: asking questions to the witnesses which prejudiced the defendant; making unfavorable comments about him in front of the jury; making comments prejudicial to the defendant concerning the theory of the defense; not allowing him to bring evidence on the lunacy of some his predecessors; not allowing Dr. Alonso Caíñas to testify on the reaction that a person like the defendant can have on arriving at his home and finding a pool of blood on the floor, as well as defendant's reaction in suddenly meeting his sisters' aggressor; and in refusing to instruct the jury on voluntary manslaughter.

We need not discuss the errors separately. It is sufficient to state that it was always defendant's theory that if Castro Montalvo was alive when he wounded him, his behavior was due to a heat of passion, but not to premeditation or deliberation. The court, we repeat, did not permit the defendant to present evidence of any kind on the reactions that the defendant might have suffered, notwithstanding the fact that it was fully aware of that theory and despite it having repeatedly stated so. Let us examine, nevertheless, Dr. Alonso Caíñas's testimony as it appears from the record. He stated:

"Human beings react differently to pain, anxiety, fear, and terror and the normal reactions of a normal person, . . . must be considered in the light of their schooling, intellect, environment, inheritance, education, . . . That is, the character consists of a series of sporadic disciplines, simple and spontaneous, which impress an initial trait from boyhood, adolescence, adulthood, old age, men and women, *and then it can produce, in the future like the case herein, . . . reactions of pride, anger, pain, revenge, complete disturbance in the nervous system and in the mind and an individual may lose his mental balance and commit abnormal acts when that normal balance is lost.*

". . . . . . . . . .

"*I have heard here about an individual with a highly impulsive temper, in an emotional condition of surprise, pain, of some-*

*one dear who has been supposedly wounded, whom he cannot find, working up his mind to a series of reactions, of doubt and confusion, which stimulate his condition of mental disorder; of a normal individual, whose balance is lost and an emotional shock is produced, the typical one, capable of committing the acts of which he is accused."* (Italics ours.)

The court, despite knowing that the defendant was trying to show that he had acted under a heat of passion, adhered to its theory that the latter was only trying to show that he was insane at the moment when he committed the act of which he was accused and refused to allow the questioning on the afore-mentioned points.

The *Fiscal* of this Court upon acquiescing in the reversal says:

"We understand that the evidence introduced by the defense and which was nowise contradicted by the evidence of the prosecution made it indispensable to instruct the jury concerning voluntary manslaughter."

It is undeniable that—notwithstanding the court's action in not permitting the defense to question Dr. Alonso Caíñas more extensively—according to the testimony of the medical expert for the defense, a doubt might have arisen as to whether when the defendant stabbed Castro Montalvo, he did so under a heat of passion. That was not a question to be decided by the court and before such situation it should have instructed concerning voluntary manslaughter. Such instruction was expressly requested by the defendant and upon being refused, he properly took an exception. The commission of such error warrants the reversal of the judgment. *People* v. *Calderón*, 50 P.R.R. 323; *People* v. *Villanueva*, 49 P.R.R. 61; *People* v. *Fernández*, 49 P.R.R. 571. See also 41 C.J.S., pp. 155, 214, §§ 371, 395.

As decided by the United States Supreme Court in *Stevenson* v. *United States*, 162 U. S. 313, 314, 40 L. Ed. 980:

"The evidence as to manslaughter need not be uncontradicted or in any way conclusive upon the question; so long as there is

some evidence upon the subject, the proper weight to be given it is for the jury to determine. If there were any evidence which tended to show such a state of facts as might bring the crime within the grade of manslaughter, it then became a proper question for the jury to say whether the evidence were true and whether it showed that the crime was manslaughter instead of murder.

"    .    .    .    .    .    .    .    .    .    .

"The evidence might appear to the court to be simply overwhelming to show that the killing was in fact murder, and not manslaughter or an act performed in self defenee, and yet, so long as there was some evidence relevant to the issue of manslaughter, the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court."

See also *Kinard* v. *United States*, 96 F. 2d 522 (1938) in which the United States Court of Appeals for the District of Columbia said:

"It is true that the defendant's testimony was sharply contradicted. It is arguable that the evidence was overwhelmingly indicative of murder rather than manslaughter . . . It was not the duty of the trial court to weigh the evidence and determine whether the defendant was guilty of murder or manslaughter, but merely to determine the preliminary question of law—whether there was such a complete absence of evidence upon the issue of manslaughter as to require that it be taken from the consideration of the jury . . .

"The fact that in the present case there was other evidence highly persuasive of guilt of murder does not affect the applicability of the rule stated."

In support of the foregoing *Stevenson* v. *United States, supra,* and others are cited.

Under the circumstances of the present case we think that it was the duty of the lower court to give instructions concerning manslaughter and that by failing to do so, it committed prejudicial error against the defendant. Therefore, it is not necessary to discuss the other errors assigned.

The judgment appealed from will be reversed and the case remanded to the lower court for a new trial.