**UNITED STATES of America**

v.

**Charles COMER, Appellant.**

**No. 22383.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 10, 1969.

Decided Jan. 5, 1970.

Mr. Robert W. Coll, Washington, D. C. (appointed by this court), for appellant.

Mr. Kenneth C. Baumgartner, Sp. Asst. to U. S. Atty., with whom Messrs. Thomas A. Flannery, U. S. Atty., and Roger E. Zuckerman, Asst. U. S. Atty., were on the brief, for appellee. Mr. David G. Bress, U. S. Atty. at the time the record was filed, Miss Carol Garfiel, Asst. U. S. Atty. at the time the record was filed, and Mr. John A. Terry, Asst. U. S. Atty., also entered appearances for appellee.

Before WRIGHT, McGOWAN and LEVENTHAL, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

During the early morning hours of Friday, November 10, 1967, Mrs. Sarah Comer bled to death from a stab wound in her left thigh. Appellant, her husband of 19 years, was charged with inflicting the fatal wound. A jury found him guilty of second degree murder (22 D.C.Code § 2403 (1967)), and the District Court sentenced appellant to prison for ten to 30 years.

On this appeal, appellant primarily [1] challenges the trial court's refusal to instruct the jury on manslaughter despite appellant's timely request. For the reasons set forth below, we agree that the

---

[1]. Appellant has also urged several other grounds for reversal upon us, including insufficiency of the evidence to sustain a second degree murder verdict. In view of our disposition of the case, we do not pass upon appellant's insufficient argument. However, we have carefully reviewed his other assignments of error and found that, on the basis of this record, they did not substantially affect appellant's rights.

trial court erred in not giving appellant's requested manslaughter instruction, and we reverse his conviction.

## I

The decision to grant or to refuse an instruction on a lesser included offense turns on the state of the evidence. We therefore recount in some detail the evidence adduced at appellant's trial.

The Government's case against appellant was entirely circumstantial. It rested primarily upon evidence discovered in appellant's apartment and upon appellant's statements to the police on the morning of the killing. The police arrived at the Comers' first-floor apartment at about 9:30 Friday morning in response to appellant's telephone call. There they discovered the decedent lying on her back on the bedroom floor. Her body, which was cold and stiff, was partially clothed in a skirt, half-slip and underpants. The only people in the apartment were appellant and a five-year-old girl who was identified as appellant's step-granddaughter.

At trial, the police officers testified that during their investigation they searched the apartment and found blood in several places, most of it in the bedroom. Specifically, a large quantity of matted blood was on the floor of the bedroom under one side of the bed. There was another large pool of blood on the mattress cover, directly above the blood on the floor, although a bedspread had been pulled over the bed concealing the blood on the mattress cover.

A pan in the bathroom contained a pinkish liquid, and drops of blood and vomitous material were found on the commode. In a kitchen drawer the police discovered a paring knife with blood on it. And finally, a wet gray shirt with a dark patch of blood on it was found in a trash can on the back porch. Pictures introduced at trial showed the front and rear entrances to the apartment to be free of any blood.

The investigating officers further testified that the body itself had a few streaks of blood on the hands and upper torso and a small laceration on the front of the left thigh. With the exception of a few small spots, no blood was found on the underpants, half-slip and skirt which covered the decedent's wound when she was found. There were also no holes—such as would have been made by a knife—in the decedent's clothes anywhere in the vicinity of the wound.

During the course of the police investigation at the apartment Friday morning, appellant was interviewed by the officers intermittently.[2] At the trial, the officers testified that appellant appeared intoxicated and that initially he denied cleaning up the apartment. When the police found the bloody shirt in the trash and the pink liquid in the bathroom, however, appellant changed his story, explaining that he had used both in cleaning up the apartment. In addition, the police testified that appellant told them that the paring knife found in the kitchen had been used to cut liver the night before. One detective also testi-

2. Appellant suggests that the police should not have been permitted to testify over objection about the content of the statements made to the police that morning. Some of these statements were exculpatory, some tended to be inculpatory, and many were simply inconsistent with each other. The police acknowledged that appellant was never warned of his rights. *See* Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant, however, himself summoned the police to his apartment. The police did not place him under arrest and did not arrest him until six days later, after they had received the results of the autopsy.

According to the testimony of the investigating officer, he did not know whether Mrs. Comer had died of natural causes or not when he was making his investigation. Indeed, much of the interview with appellant involved questions about his wife's medical history. Further, there is no indication that the questioning was at all protracted, and many of the statements were apparently volunteered by appellant to the police. While Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), clearly held *Miranda* applicable to custodial interrogation in a person's home, it does not seem applicable in the present case.

fied that at several times during the interview appellant "put his hands up in front of him and stated, 'I don't have to tell you here. Take me to jail.'"[3] The subsequent autopsy on the decedent's body showed that the thigh wound, which was three eighths of an inch long, was eight inches deep, that the femoral artery had been severed, and that the decedent had bled to death. The coroner who conducted the autopsy testified that such a wound would bleed heavily as soon as it was inflicted; if no pressure were applied to stem the loss of blood, the victim would go into disabling shock within five to 15 minutes. Moreover, he also testified that, in his opinion, any movement would have increased the bleeding from the decedent's wound. Since the autopsy had indicated that the alcohol content of the decedent's blood was very high, the coroner's judgment was that the decedent would have been too drunk to apply the necessary pressure and walk any significant distance.

Appellant testified in his own behalf. He denied guilt and denied any knowledge of the immediate circumstances leading up to his wife's death. His story was that his wife had gone out drinking Thursday evening and that he had gone to bed early. According to his story, he awoke the next morning to find his wife dead on the floor of their bedroom. He denied cleaning up the apartment, recognizing the bloody knife, or placing a shirt in the trash.

The remainder of appellant's testimony involved facts which might suggest that the killing occurred outside the apartment or that an outsider, specifically his wife's lover, had done the killing. Appellant testified that his wife was "going with" a man named Paul Williams and that two months before her death appellant had returned home unexpectedly to discover that Williams had moved in with appellant's wife. Since that time, Williams had made periodic telephone calls to appellant's wife, several of which appellant had intercepted. On the day before Mrs. Comer's death, Williams had stopped his car in front of the Comer apartment and honked his car horn.

Appellant further testified that on the morning his wife died her pocketbook and a green box containing money were missing. In addition, he found the back door unlatched although he remembered locking it the night before.

In cross-examining appellant, the prosecutor brought out further evidence of the deteriorated relationship between appellant and his wife and pressed the appellant for details about his reaction to his wife's relationship with Paul Williams.

---

3. The detectives also questioned the little girl, who told them she had slept in the same room with her grandparents and that she had heard no argument during the night. At a hearing outside the presence of the jury, the detectives characterized her as "lucid" during the interview. The child did not testify at trial, however, and the police did not tell the jury the content of her earlier statements. When information concerning a crime is in the possession of a child of tender years, difficult questions are raised for the adversary process. Not only does it pose problems in terms of the child's appreciation of the need to tell the truth with precision and accuracy, but the trauma attendant upon testifying in open court—subject to examination and cross-examination—before the unfamiliar faces of jurors, lawyers and judge may be peculiarly terrifying to a young child. American law has dealt with this problem, if not satisfactorily solved it, by leaving the question to the sound discretion of the trial judge. Doran v. United States, 92 U.S.App.D.C. 305, 205 F.2d 717, cert. denied, 346 U.S. 828, 74 S.Ct. 49, 98 L.Ed. 352 (1953). In the circumstances of the present case, where the child's testimony was not extensive and actually concerned the fact that she did not hear anything, we think it appropriate to suggest that an agreement might properly have been worked out between the prosecution and the defense to have permitted the police officer to testify concerning the substance of his conversation with the child. We, of course, in no way suggest that such a course could be pursued over objection by either side. In any event, the entire procedure would be for the trial judge to pass upon in the proper exercise of his sound discretion.

## II

■ Appellant went to trial on an indictment charging him with second degree murder. At the appropriate time, he requested that the jury also be instructed on the lesser included offense of manslaughter. The Government objected to such a charge, and the trial court denied appellant's request on the ground that there was "no evidence tending to bear" on manslaughter. Rule 31(c) of the Federal Rules of Criminal Procedure provides that the "defendant may be found guilty of an offense necessarily included in the offense charged * * *." This Rule carries forward the Act of June 1, 1872, § 9, 17 Stat. 198, which was intended to aid the prosecution when its proof fell short of its expectations. Despite the original purpose of the Rule, it may be availed of, as of right, by the defense. Stevenson v. United States, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896); Belton v. United States, 127 U.S.App.D.C. 201, 206, 382 F.2d 150, 155 (1967); United States v. Markis, 2 Cir., 352 F.2d 860, 866 (1965). Thus, in an appropriate case, failure to grant an instruction on a lesser included offense requested by the defense is reversible error.

The difficulty, of course, lies in determining whether a case is "appropriate" for application of the Rule. In making this determination, two questions must be decided: First, is the relationship between the greater offense and the lesser offense such that a lesser offense charge is proper? Second, does the evidence in the specific case justify giving the lesser offense charge?

■ For purposes of the present case, we need not pause over the first question. Manslaughter has long been recognized as a lesser included offense within second degree murder. Stevenson v. United States, *supra;* Belton v. United States, *supra.* We therefore turn to a consideration of the evidentiary predicate necessary to support a request for a lesser included offense instruction.

■ The standard for determining when an instruction on a lesser included offense must be given cannot be stated with complete precision. It must balance the competing principles that, on the one hand, fact-finding in our jurisprudence is the sole province of the jury, but, on the other hand, the jury is not free to render a verdict "in flagrant disregard of all the proof." Sparf v. United States, 156 U.S. 51, 64, 15 S.Ct. 273, 278, 39 L. Ed. 343 (1895).

■ The Supreme Court's most recent formulation of the proper test came in Sansone v. United States, 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965). There the Court declared that " '[i]n a case where some of the elements of the crime charged themselves constitute a lesser crime, the defendant, *if the evidence justifie[s] it . . . *[is] entitled to an instruction which would permit a finding of guilt of the lesser offense.' Berra v. United States [351 U.S. 131], at 134 [76 S.Ct. 685 at 688, 100 L.Ed. 1013]." 380 U.S. at 349, 85 S.Ct. at 1009. (Emphasis added.) Specifically, the Court held:

> "* * * A lesser-included offense instruction is only proper where the charged greater offense requires the jury to find *a disputed factual element* which is not required for conviction of the lesser-included offense * * *."

380 U.S. at 350, 85 S.Ct. at 1009. (Emphasis added.) In *Sansone,* which involved income tax offenses, the Court held that the decision to give a lesser included offense instruction depended on whether "there are disputed issues of fact which would enable the jury rationally to find that" all the elements of the lesser included offense had been proved. 380 U.S. at 351, 85 S.Ct. at 1010. In short, as we have noted in *Belton,* a defendant is entitled to instructions on a lesser included offense only "where there is evidence in the record to support a finding of guilt on that offense." Belton v. United States, *supra,* 127 U.S.App.D.C. at 206, 382 F.2d at 155.

■ In analyzing the Supreme Court's concern in this regard, Judge Coffin of the First Circuit, writing for the court in Driscoll v. United States, 1 Cir., 356 F. 2d 324, 327 (1966), has phrased the inquiry well:

"We take *Sansone* to mean that when the government has made out a compelling case, uncontroverted on the evidence, on an element required for the charged offense but not for the lesser-included offense, there is a duty on defendant to come forward with some evidence on that issue if he wishes to have the benefit of a lesser-included offense charge. * * * *Two prerequisites* [to denying a request for a lesser included offense instruction] *seem vital: that there be no factual dispute and that a finding contrary to the only evidence on the issue would be irrational.*"

(Emphasis added.) Thus the trial court must appraise the evidence bearing on the element required for the charged offense, but not required for the lesser included offense, and make two determinations. The court must first decide whether there is any conflict in the evidence that has been introduced insofar as it bears upon that element. This part of the test has been phrased by this court, in the context of a request for a manslaughter instruction, as whether

"there is 'any evidence fairly tending to bear upon the issue of manslaughter,' however weak * * *. * * * * And there may be 'some evidence' of a lesser offense even though this depends on an inference of a state of facts that is ascertained by believing defendant as to part of his testimony and prosecution witnesses on the other points in dispute. * * * *"

Belton v. United States, *supra,* 127 U.S. App.D.C. at 206, 382 F.2d at 155.

■ Even if the trial court finds that the facts bearing upon the element required for the greater offense but not for the lesser are not in dispute and that no evidence introduced explicitly tends to negative a finding of the element in ques-

tion, the inquiry is not at an end. Rather the court must appraise all the testimony and evidence to determine whether it is capable of more than one reasonable inference. Thus in a manslaughter case such as the present one, the inquiry is whether the evidence bearing on malice was so compelling and unequivocal on the issue that a jury finding of no malice would be irrational. *See* Driscoll v. United States, *supra,* 356 F.2d at 327. In *Belton* Judge Leventhal specifically noted that

"[t]here may be cases where that kind of reconstruction [supporting the lesser offense] is fairly inferable from testimony though not directly stated therein * * *."

127 U.S.App.D.C. at 207, 382 F.2d at 156. Only after pursuing this further inquiry is it proper to deny a request for an instruction on a lesser included offense.

Finally, we note that our opinions have repeatedly emphasized our conviction that the jury's role as fact-finder is so central to our jurisprudence that, in close cases, the trial court should generally opt in favor of giving an instruction on a lesser included offense, if it is requested:

" * * * [W]e suggest that where the issue is close, the request of defense counsel may properly be given the benefit of the doubt. * * * *"

Belton v. United States, *supra,* 127 U.S. App.D.C. at 207, 382 F.2d at 156.

### III

■ Applying these principles to the present case, we think it clear that the manslaughter instruction should have been given as requested. The element which must be proved to convict of second degree murder but not of manslaughter is malice. "Malice," of course, is a term of art referring to the state of mind with which appellant must be found to have acted. As this court noted in Belton v. United States, *supra,* 127 U.S.App.D.C. at 204, 382 F.2d at 153: "Malice is an ultimate fact that can rarely be proved by direct evidence."

In the present case, the Government's entire case was circumstantial. Not only did the Government have to rely on circumstantial evidence to support an inference of malice, it also had to rely on circumstantial evidence to support an inference that appellant Comer inflicted the wound. At best, the jury could have believed that the large amount of blood on the bed suggested that Mrs. Comer bled to death there, and appellant claims to have slept in that bed all night. Further, the absence of blood or any other damage on the decedent's clothing suggests that she was stabbed while she was undressed. Subsequently someone apparently cleaned her wound and dressed her in clean clothes, all in her own bedroom. Moreover, if the jury believed the testimony of the police officers that appellant at times admitted cleaning up the apartment, it may have inferred that he not only cleaned up the apartment, but was also responsible for spilling blood in it in the first place.

But to convict of second degree murder, the jury was required to construct an even further chain of inferences in order to find malice. Such a finding had to be based solely on appellant's statements to the police, his apparent efforts to clean up the apartment, Mrs. Comer's history of infidelity, and the use of a kitchen paring knife to inflict a thigh wound. At best, therefore, the Government's case on malice was very weak.

Appellant's theory, of course, was that he did not commit the act and, therefore, he introduced no evidence to show that the act was committed without malice. It may be, however, that appellant's testimony concerning his wife's lover, the police testimony of appellant's intoxication, and the autopsy evidence showing that Mrs. Comer was intoxicated when she died do, in fact, provide "some evidence, however weak" tending to support a manslaughter charge. We need not pursue this issue, however, since in our view a manslaughter instruction is obviously required under the second test outlined in Part II, *supra*.

For even if an inference of malice was permissible on the basis of the evidence in this case, a question which we do not decide,[4] it was certainly not compelled. We simply do not know what happened in the Comers' apartment. And the evidence in the record supports a construction of events which would justify a finding of killing without malice at least as well as it supports a finding of a killing with malice. This point is perhaps best made by quoting the prosecutor's own closing argument to the jury:

> "I suggest to you that if in fact he woke up when she came by, what happened was they got into a quarrel about Paul Williams or there was some fight or argument between them and he got the kitchen knife and killed his wife out of jealousy because of some thought in the defendant's mind."

It seems clear that this reconstruction is at least as consistent with manslaughter as it is with second degree murder.

A wife's adulterous conduct has long been recognized as the classic provocation for homicide. Whether that provocation was "such as might naturally induce a reasonable man in the passion of the moment to lose self-control and commit the act on impulse and without reflection,"[5] thereby justifying a verdict of manslaughter, is ordinarily for the jury, particularly where, as here, the husband is reminded of the conduct immediately before the fatal act.[6]

Consequently, the trial court's denial of appellant's request for a manslaughter instruction was error, and appellant is entitled to a new trial before a properly instructed jury,[7] unless the Government

---

4. *See* Note 1, *supra*.

5. Austin v. United States, 127 U.S.App. D.C. 180, 188, 382 F.2d 129, 137 (1967).

6. *See* Whitsett v. State of Tennessee, 201 Tenn. 317, 299 S.W.2d 2 (1957).

7. It appears that many of the exhibits introduced into evidence at appellant's trial have been lost. Although the District Court has provided by Executive Order the proper procedure to be followed

consents, and the trial court considers it in the interest of justice after hearing from both parties, to enter a judgment of manslaughter. *See* United States v. Wharton, U.S.App.D.C., (No. 22,433, decided January 5, 1970) (slip opinion, p. 20); United States v. Bryant, 137 U.S. App.D.C. 124, 420 F.2d 1327 (decided December 11, 1969) (amending order filed December 16, 1969). *Compare* Austin v. United States, 127 U.S.App.D.C. 180, 193–194, 382 F.2d 129, 142–143 (1967).

Reversed.

in preserving tangible evidence, the rule apparently was not followed in this case. While this unfortunate occurrence may create problems for retrying appellant, it provides no basis for affirming a conviction when there has been error committed during the trial.