Billie Lee **PENDERGRAST**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 7428.

District of Columbia Court of Appeals.

Argued Nov. 20, 1974.

Decided Feb. 18, 1975.

Mervin Cherrin, Washington, D. C., also appointed by this court, entered an appearance for appellant.

Julius A. Johnson, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before KELLY, FICKLING, and HARRIS, Associate Judges.

HARRIS, Associate Judge:

Appellant was charged with second degree murder in connection with the death of Charles Perry. D.C.Code 1973, § 22–2403. A jury found him guilty. At sentencing, he was committed to the custody of the Attorney General "for treatment and supervision" under § 5010(b) of the Youth Corrections Act. 18 U.S.C. § 5010(b) (1970). We reject the argument that the Superior Court's exercise of jurisdiction over appellant as an adult was improper, but find error in the trial court's denial of the government's request (acceded to by defense counsel) for a jury instruction on the lesser included offense of manslaughter. Accordingly, we reverse the conviction.[1]

I

In the summer of 1972, appellant was 17 years of age. On a hot Sunday afternoon in late July, appellant and others in the neighborhood of the 1300 block of Corcoran Street, N.W., were playing in the drenchings of an open fire hydrant. Charles Perry, a slight man in his late 40's, ventured by and had buckets of water thrown on him. Perry, who lived on the block, went to put on dry clothes. The hydrant was shut off, and the participants,

W. Gary Kohlman, Washington, D. C., appointed by this court, for appellant.

1. Appellant urges other grounds for reversal, most of which need not be reached in light of our disposition of this appeal. One, however, should be mentioned preliminarily (see also n. 5, *infra*). At trial, defense counsel sought to introduce evidence of appellant's reputation for truth and veracity, but he was not permitted to do so. The trial court's ruling on this evidentiary question was erro-

neous. The circuit court stated in Shimon v. United States, 122 U.S.App.D.C. 152, 156, 352 F.2d 449, 453 (1965):

Thus a Defendant may try, whether or not he takes the stand, to cast doubt on the probability of guilt by showing that some in his community believe him to be truthful and honest. [Footnote omitted.]

including appellant, returned to their homes. Angered by his saturation, Perry, openly displaying a pistol in his belt, told one witness that he "didn't like it and what he was going to do to the MF's that threw water on him." Appellant, at home and within earshot of Perry, claimed the older man said "if someone wet him up again he was going to shoot somebody, something like that."

Accompanying Perry's general threat was abusive language directed at appellant's mother, Alice Jackson, and an explicit threat against appellant. Pendergrast could hear the vituperation being directed against both his mother and him. As he left his apartment, his foot brushed against a baseball bat. He picked it up and walked outside to confront Perry.

Pendergrast found Perry sitting in a chair on the sidewalk. Angry words passed between the two. There were four recollections of this exchange, including those of appellant and two government witnesses, Mrs. Winston and Mr. Johnson. All were substantially similar. There was evidence that appellant thought Perry had a gun in his pocket. Mrs. Winston testified that appellant said:

I heard you have been talking about me. I am tired of you talking about me. You pulled a knife out on me and threatened me with a gun. If you go toward your pocket I will hit you with this God damn bat.

Mr. Johnson remembered the words as:

I'm really tired of this. You drew your knife on me and you caught me up the street and drew your pistol on me. . . . I'm tired of this. . . . Don't go in your pocket . . . .

The evidence was conflicting as to the precise nature of the hand movements then made by Perry. Mrs. Winston, the chief government witness, testified that Perry's right hand was "going towards his pocket", meaning his shirt pocket on the left side. Appellant's mother said that she saw Perry's hand slowly move to his right (presumably pants) pocket and slowly come out. Garnell Young, another defense witness, testified that he saw Perry reach "down toward his side", although he did not see Perry actually go into his pocket. Additional evidence was offered by the defense to show that Perry was rising from his chair simultaneously with the hand movements. The prosecution disputed this contention, but Mrs. Winston did testify that Perry "reached up a little bit."

At that moment, the volcanic conversation erupted. Appellant, apparently believing that Perry was both armed and drunk and that he (appellant) "would not have time if he pulled a gun out of his pocket", struck one quick blow with the baseball bat to the left side of Perry's head. Pendergrast testified that he "didn't aim"; he "just swung the bat . . . out of fear." Perry, conscious but bleeding, was taken to the hospital, where emergency surgery was performed.

Three days later, Pendergrast was petitioned as a juvenile in the Family Division on a charge of assault with intent to kill. On October 10, 1972, Perry died, allegedly as a result of the assault, and the Family Division petition was dismissed on the government's motion. The next day, the United States Attorney charged appellant as an adult with second degree murder pursuant to the election provision of D.C.Code 1973, § 16–2301(3)(A). Appellant was tried as an adult in Superior Court and convicted.

II

At the outset, we are confronted with a challenge to the jurisdiction of the trial court to try appellant as an adult. The incident in issue here occurred on July 23, 1972. Perry was rushed to a hospital where he was to remain for more than a month. Two days after the blow was struck, appellant was arrested. Since the charge was assault with intent to kill, and since appellant was 17 years old, the United States Attorney could have prosecuted him as an adult. D.C.Code 1973, § 16–2301(3)(A). However, that option was not exercised, and appellant was charged as

a child in the Family Division. Appellant now contends that once Family Division jurisdiction attached, such jurisdiction could not be divested without the holding of a transfer hearing pursuant to D.C.Code 1973, § 16–2307.

Appellant relies principally on Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). That case dealt with the construction of the pre-court reorganization predecessor of the present statute. The District of Columbia Juvenile Court Act, as it was then known, was interpreted as requiring a hearing prior to the Juvenile Court's waiver of jurisdiction over a juvenile. *Kent* thus was decided in the context of pre-court reorganization standards for determining when jurisdiction over a juvenile first attached.

Prior to 1970, the Juvenile Court automatically acquired jurisdiction over anyone under 18 charged with an offense, since the term "child" then was defined simply as "a person under 18 years of age." Act of Dec. 23, 1963, Pub.L. No. 88–241, § 1, 77 Stat. 586. Jurisdiction attached to the person of the accused, and continued throughout his minority or until explicitly relinquished by the Juvenile Court. In re Lem, D.C.Mun.App., 164 A.2d 345, 348 (1960).

In 1970, Congress enacted the District of Columbia Court Reorganization Act, which in part amended § 16–2301 of the D.C.Code. The amendment changed the definition of a "child" and, derivatively, altered the scope of Family Division jurisdiction. Section 16–2301(3)(A) now states:

The term "child" means an individual who is under 18 years of age, except that the term "child" does not include an individual who is sixteen years of age or older and—

(A) charged by the United States attorney with (i) murder, forcible rape, burglary in the first degree, robbery while armed, or assault with intent to commit any such offense, . . .

The legislative history of the Act makes it clear that this change was meant to work a substantive contraction of the Juvenile Court's earlier jurisdiction. Congress stressed that:

Because of the great increase in the number of serious felonies committed by juveniles and because of the substantial difficulties in transferring juvenile offenders charged with serious felonies to the jurisdiction of the adult court under present law, provisions are made in this subchapter for a better mechanism for separation of the violent youthful offender and recidivist from the rest of the juvenile community.

H.R.Rep.No.907, 91st Cong., 2d Sess. 50 (1970). Additionally, Congress stated that under the new bill,

a person, 16 years of age or older, who is charged by the United States Attorney with an enumerated violent crime is automatically subject to the jurisdiction of the adult court.

*Ibid.* Such language further conveys the intention of Congress that jurisdiction over a 16- or 17-year-old juvenile charged with one of the specified offenses is not to be exercised in the Family Division unless the United States Attorney elects *not to charge* such an accused as an adult. The House Report also states that a "person 16 years or older, charged by the U. S. Attorney with an enumerated violent crime . . . is an adult . . . ." *Id.* at 149.

In an extensive footnote in his brief, appellant raises the question of the constitutionality of § 16–2301(3). In a post-court reorganization decision, the circuit court sustained the Statute's constitutionality. United States v. Bland, 153 U.S.App.D.C. 254, 472 F.2d 1329 (1972), cert. denied, 412 U.S. 909, 93 S.Ct. 2294, 36 L.Ed.2d 975 (1973). While that opinion is not binding upon us in our interpretation of the specific District of Columbia Code provision involved, we share and endorse the views expressed by the *Bland* majority. Congress may define who is a child for the

purposes of the special treatment the juvenile statutes provide, and Congress has chosen to permit the exclusion of persons in a situation such as appellant's from such treatment. We conclude that Family Division jurisdiction attaches only if the United States Attorney declines to prosecute in a § 16–2301(3) case.

■ Finally, certain facts should be stressed. This is not a case in which the United States Attorney could have elected to charge appellant with murder on July 26, 1972. The opportunity for such action did not arise until 2½ months after the assault, when Perry died. On October 11, the offense charged was different from that which had been petitioned on July 26, both in its elements and in its magnitude. *Cf.* Blackledge v. Perry, 417 U.S. 21, 29 n. 7, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); Diaz v. United States, 223 U.S. 442, 32 S. Ct. 250, 56 L.Ed. 500 (1911). Certainly there was no dilatoriness in the charging process. When Perry's death occurred, the dismissal of the juvenile petition and the filing of the adult charge were accomplished promptly. There was no need for a transfer hearing, and there was proper jurisdiction for the trial of appellant for murder as an adult.

### III

■ Appellant's primary challenge is to the failure of the trial judge to instruct the jury on the lesser included offense of manslaughter. The determination of whether a lesser included offense instruction is required turns upon the answers to two questions. First, is the relationship between the greater offense and the lesser offense such that a lesser offense instruction would be proper; that is, does the lesser offense consist entirely of some but not all of the elements of the greater offense? Sansone v. United States, 380 U.S. 343, 349–50, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965); Berra v. United States, 351 U.S. 131, 134, 76 S.Ct. 685, 100 L.Ed. 1013 (1956). Second, does the evidence justify giving the charge; that is, is there a suffi-

cient evidentiary predicate to support the charge? United States v. Comer, 137 U. S.App.D.C. 214, 218, 421 F.2d 1149, 1153 (1970).

■ The first question readily is answered in this case. Manslaughter long has been recognized as a lesser included offense of second degree murder. *See e. g.,* Stevenson v. United States, 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896); Belton v. United States, 127 U.S.App.D.C. 201, 382 F.2d 150 (1967); United States v. Comer, *supra.* Thus only the question of the evidentiary predicate remains.

The ancestral guide is Stevenson v. United States, *supra.* The Supreme Court there stated in 1896:

> The evidence as to manslaughter need not be uncontradicted or in any way conclusive upon the question. So long as there is some evidence upon the subject, the proper weight to be given it is for the jury to determine. If there were any evidence which tended to show such a state of facts as might bring the crime within the grade of manslaughter, it then became a proper question for the jury to say whether the evidence were true, and whether it showed that the crime was manslaughter instead of murder. * * * The evidence might appear to the court to be simply overwhelming to show that the killing was in fact murder, and not manslaughter, or an act performed in self-defense, and yet, so long as there was some evidence relevant to the issue of manslaughter, the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court. (162 U.S. at 314–315, 16 S.Ct. at 839.)

In *Stevenson,* the defendant was charged with the shooting of another. There was evidence that the decedent had threatened Stevenson with a gun some 45 minutes prior to the shooting. Were such an armed threat all that constituted "some evidence" or "any evidence tending to negate a finding of murder," *Stevenson* alone

would be dispositive of this case. *Stevenson,* however, included not only a prior threat with a deadly weapon but also an actual assault with that weapon upon the defendant. We thus must proceed to consider *Stevenson's* progeny and the evidence introduced in this case to see whether what appellant presented at trial constituted "any evidence which tended to show . . . manslaughter."

Sansone v. United States, *supra,* involved two income tax offense statutes. One made certain activity a felony; the other made less aggravated conduct a misdemeanor. The Court found that the defendant was not entitled to a lesser included offense instruction where the only issue at trial was whether his attempt to evade income taxes was willful, with willfulness being a necessary element for conviction under each of the statutes. The Court stated (380 U.S. at 350, 85 S.Ct. at 1009):

> A lesser-included offense instruction is only proper where the charged greater offense requires the jury to find a disputed factual element which is not required for conviction of the lesser-included offense.

▮ The cases in this circuit which interpret *Stevenson* and *Sansone* show that

the phrase "any evidence" tending to create a dispute as to a factual element should be interpreted broadly. For example, in Belton v. United States, *supra* 127 U.S. App.D.C. at 206, 382 F.2d at 155, the court said " 'any evidence' . . . however weak." *See generally* United States v. Comer, *supra* 137 U.S.App.D.C. at 218–19, 421 F.2d at 1153–54.

▮ Pendergrast's trial was lengthy. Based upon the facts previously recited and the evidence now to be discussed, we conclude that there was "some evidence" which tended "to show such a state of facts as might bring the crime within the grade of manslaughter."[2] Stevenson v. United States, *supra* 162 U.S. at 314, 16 S.Ct. at 839.

Appellant testified he thought Perry had a gun at the time of the incident, and another witness stated he heard appellant say 'I thought he had a gun.' The bases for appellant's apprehension were apparently several. First, appellant said that he had seen Perry wave his gun earlier on the date of the incident.[3] Second, appellant knew that Perry previously had shot someone else in the neighborhood. Third, it was Pendergrast's impression, gained from both hearsay and actual knowledge, that

2. The requirement of "some evidence" is usually met by conflicting testimony on a disputed fact or where a lesser included offense is fairly inferrable from the evidence, including a reconstruction of events gained by accepting the testimony of one or more witnesses even in part. United States v. Sinclair, 144 U.S.App.D.C. 13, 14–15, 444 F.2d 888, 889–90 (1971). Thus, even if the trial court found that the facts bearing on the element required for the greater offense but not for the lesser offense (here, malice) were not in dispute, the inquiry would not be at an end. Rather, the court must appraise all the evidence to see if it is capable of more than one reasonable inference. United States v. Comer, *supra,* 137 U.S.App.D.C. at 219, 421 F.2d at 1154.

The government relies primarily on Belton v. United States, *supra,* and United States v. Sinclair, *supra,* in disputing the existence of a factual predicate for a lack of malice. In *Belton,* appellant claimed that he was not even present when the fatal shooting of his wife occurred. The court found that no evi-

dence at all bearing on the issue of malice could not meet the "some evidence" test. Accordingly, the request for the lesser included offense instruction was denied. Similarly, in *Sinclair* the defense offered no evidence at all on the reason for appellant's nighttime presence in a clothing shop. Again the court found that no evidence was not "some evidence", and said that "the judge is not required to put the case to the jury on a basis that essentially indulges and even encourages speculations as to bizarre reconstruction." 144 U.S.App.D.C. at 15, 444 F.2d at 890. In light of their evidentiary vacuums on the issues pertinent to a lesser offense instruction, we find *Belton* and *Sinclair* consistent with other precedent and readily distinguishable from the case before us.

3. Additionally, one witness testified that the decedent had a pistol in his belt that afternoon, and another stated that he saw a gun near where Perry had been sitting, shortly after he was struck.

Perry always carried a gun. Fourth, appellant thought Perry had been drinking at the time, having seen gin at the decedent's side.[4]

It is undisputed that heated words were exchanged at the fateful meeting of Perry and Pendergrast. Pendergrast, according to his own recollection and that of two others, warned Perry not to make a move for his pocket. At that point, Perry did make some movement with his hand. While we assess neither the credibility of the witnesses nor the weight of the evidence, we note that his hand variously was described as going toward his right pocket, going toward his shirt pocket, and just reaching down.

The jury, of course, was at liberty to disbelieve any or all of the evidence presented on behalf of appellant in arriving at a verdict. It is, however, impermissible for the trial judge to weigh the evidence for the jury. The court's duty is merely "to determine the preliminary question of law—whether there was such a complete absence of evidence upon the issue of manslaughter as to require that it be taken from the consideration of the jury." Kinard v. United States, 68 App.D.C. 250, 253, 96 F.2d 522, 525 (1938). Our examination of the evidence reveals no such absence. Appellant's state of mind was in issue, not just in the sense of malice or no malice, but also in the sense of a different degree of culpability. Based on the evidence presented, it would not have been irrational for the jury to find that appellant acted recklessly or upon provocation. *See* United States v. Comer, *supra* 137 U.S. App.D.C. at 219, 421 F.2d at 1154. The trial judge apparently felt that a finding of no malice would be consistent only with complete exculpation on the basis of self-defense. It is also true, however, that a finding of acting without malice is entirely consistent with a finding of acting recklessly or upon provocation.[5] Because there was "some evidence" indicating that Pendergrast may have acted without malice, the trial judge erred in not giving the manslaughter instruction.

---

4. We note certain additional testimony of corroborative (but nondispositive) effect. Mrs. Jackson testified that she saw Perry consume two drinks 20 minutes prior to the incident and that Perry drank heavily, becoming loud and nasty on doing so. Another witness testified that Perry was drunk when he was struck. A third witness stated that he and Perry drank together four to five times per week and that the latter "was a very touchy person when he started drinking [with] a quick temper."

5. *See* Kinard v. United States, *supra* 68 App. D.C. at 254, 96 F.2d at 526. The jurors may have rejected Pendergrast's self-defense claim either because they felt he used excessive force or because they believed his apprehension of harm was unreasonable under the circumstances. If the jury rejected appellant's self-defense claim on either of these grounds, the crime might well have been manslaughter. United States v. Wharton, 139 U.S.App.D.C. 293, 301, 433 F.2d 451, 459 (1970).

More than mere speculation gives rise to this possibility in this case. As court was reassembling to hear the jury announce its verdict, the trial judge informed counsel as follows:

Before the jury comes in—I have received two notes. The first note that I received from the jury stated, "We would like the malice instruction and the one on self-defense." I replied, "You heard it ladies and gentlemen. Do the best you can to recall what I told you." The other note is that the jury has reached a verdict.

Those communications between judge and jury occurred without notice to, and out of presence of, counsel. While this colloquy alone, upon the showing of a reasonable possibility of prejudice, might require reversal, Walker v. United States, 116 U.S.App.D.C. 221, 322 F.2d 434 (1963), cert. denied, 375 U.S. 976, 84 S.Ct. 494, 11 L.Ed.2d 421 (1964), we need not decide that issue.

The jury apparently had some confusion over (or question about) the issue which was impermissibly permitted to become the single intent issue to be decided: malice or no malice. The question of appellant's misjudgment of the reasonableness of his apprehension or the force used under the circumstances may well have been at the core of the deliberations. Had the trial judge properly informed counsel of the jury's request for further instructions, counsel might well have raised again the necessity for a manslaughter instruction. Had such a charge ensued, the critical defect at trial would have been cured.

The government contends that the absence of such an instruction should not be held to be reversible error because defense counsel did not formally request it. The government itself argued vigorously for the instruction immediately prior to its closing argument, and the Assistant United States Attorney stated: "I think that [defense counsel] agrees that manslaughter should be given." Defense counsel responded, "I certainly offer no strong objection to Your Honor's addition on manslaughter." The question thus was presented squarely to the trial judge, giving him a sufficient opportunity to prevent the error and to avoid further proceedings. *See, e. g.,* United States v. Indiviglio, 352 F.2d 276, 280 (2d Cir. 1965) (en banc); Villaroman v. United States, 87 U.S.App. D.C. 240, 241–42, 184 F.2d 261, 262–63 (1950).

## IV

 The trial court gave full and proper instructions to the jury on appellant's claim of self-defense. That defense was rejected by the jury by its return of a verdict of guilty of murder in the second degree. Considering all of the circumstances, this may well be an appropriate case for the government to consent to the entry of a judgment of guilty of manslaughter on remand, and for the trial court to consider such a final disposition of the proceeding after hearing from both parties. See United States v. Wharton, 139 U.S.App.D.C. 293, 303, 433 F.2d 451,

461 (1970). Such a result would obviate the necessity for an essentially purposeless new trial.

## V

I conclude with a final observation, speaking in this portion of this opinion solely for myself and not for the other two members of the division.

Appellant was committed under § 5010(b) of the Youth Corrections Act on May 22, 1973. When the division agreed unanimously upon the necessity for a reversal, it became desirable to expedite the preparation and issuance of this decision. However, recognizing that the average period of confinement under Youth Corrections Act commitments is 19 months,[6] I made inquiry as to whether appellant had been released. He was paroled on October 29, 1974, some 17 months after beginning his period of commitment on the second degree murder conviction (and prior to the oral argument in this appeal).

The date of issuance of this decision thus had lost its relevance to appellant's continued custody. The fact that he already has been returned to the community strengthens my belief that the entry of a judgment of guilty of manslaughter is likely be the best disposition of this case on remand. *Cf.* North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969).

Reversed and remanded.

6. See Cambrel v. United States, D.C.App., 330 A.2d 746, 747 (1975).