**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Melvin Bay GUYON,
Defendant-Appellant.**

No. 80–5025.

United States Court of Appeals,
Sixth Circuit.

Argued July 26, 1983.

Decided Sept. 26, 1983.

James R. Willis (argued), Cleveland, Ohio, for defendant-appellant.

James R. Williams, U.S. Atty., William J. Edwards, Asst. U.S. Atty. (argued), Cleveland, Ohio, for plaintiff-appellee.

Before EDWARDS, Chief Judge, and JONES and NICHOLS,* Circuit Judges.

* Honorable Philip Nichols, Jr., Circuit Judge for    the Federal Circuit, sitting by designation.

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

Appellant Melvin Bay Guyon appeals from his conviction by a jury for first degree murder of an FBI agent. Guyon was sentenced to life imprisonment under 18 U.S.C. §§ 1111 and 1114 (1976). At the opening of the trial, the United States had stipulated that it would not ask the death penalty if Guyon was convicted of first degree murder.

Many of the facts in this case are undisputed. The FBI agent who was killed was Johnnie Oliver. He was one of six FBI agents who went to a house in Cleveland on August 9, 1979, with the federal fugitive arrest warrant in their possession for Guyon's arrest.

The following background facts were also stipulated by the parties at the beginning of the trial. In March of 1978 Guyon was indicted on two felony charges in Cleveland, Ohio. He was arraigned and released on bond. When he failed to appear for arraignment, an Ohio warrant for his arrest was issued and remained in effect until August 9, 1978. In the fall of 1978, three other felony warrants for the arrest of Guyon were issued by the state of Illinois and subsequent thereto on November 1, 1978 a federal unlawful flight warrant was issued by a U.S. Magistrate in the Northern District of Illinois and turned over to the Federal Bureau of Investigation. This warrant was in effect on August 9, 1978.

While the stipulations do not specifically detail Guyon's movements, the facts at trial showed without dispute that he left Ohio for Chicago, Illinois after the Ohio felony warrants and remained there until after the three Illinois felony warrants for his arrest were issued in Chicago. He thereafter reappeared in the neighborhood of Cleveland, Ohio where he had previously lived.

Cleveland agents gained information that Guyon was staying in an apartment occupied by one Katherine Little and her and Guyon's two small children. Prior to the FBI agents' entrance into the apartment on August 9, the FBI agents had told Little that the FBI was "looking for" Guyon.

FBI agents had given a similar message to Guyon's mother and to his sister, and to his employer. The jury heard testimony that at least two of these had passed on this message to Guyon. The FBI agents also knew that Guyon constantly went armed— sometimes with two pistols.

Guyon had previously lived with Little. On his return to Cleveland from Chicago, he had discovered that one, Preston Mathis, was living with Katherine Little. After a confrontation between Guyon and Mathis, Mathis had informed the FBI that Guyon was staying at Little's apartment. When the agents approached the apartment door, (which was metal and had a peephole in it), they asked Mathis to get Little to open the door. This he agreed to do. It appears that within the apartment, Guyon first came to the door and saw Mathis through the peephole. He then told Little to go to the door, but not to tell Mathis that he, Guyon, was there, and Guyon retreated to a back room where the two children were. Mathis told Little he had some money for her and she opened the door, whereupon the FBI agents, standing nearby, shoved the door open and rushed in. Agents testified that they called out "FBI, FBI" as they entered.

Agent Oliver, with a shotgun in his hand led the charge. He met Guyon in the hallway. Guyon fired and mortally wounded agent Oliver by a shot through the heart. Oliver's shotgun shot did not hit Guyon. A number of shotgun and pistol shots were then fired in Guyon's direction, but he escaped by diving through a window and running away through a hail of gunfire. He first found refuge at his brother's house. Jessie Washington, the brother's wife, testified she met Guyon on the porch. Asked about conversation "at that point" she replied: "Well, all he said he had shot the FBI; he had shot the FBI and he shot back, and that was all." Guyon subsequently made his way by bicycle to Youngstown, Ohio, where, after another FBI encounter in which he again escaped under gunfire, he was arrested in a hospital.

The most important disputes of fact before the jury were whether or not the FBI agents announced who they were before the shooting started, and who fired first. As to the first issue (as noted above), agents on the scene testified that as they entered the door, they were calling out "FBI." In addition, Katherine Little had testified before the Grand Jury that she heard someone say, "All right, Melvin, we are the FBI. We know you are in there; come on out." At trial, however, while she admitted signing a statement to this effect, she sought to disavow it, contending that she had signed it under pressure. Guyon denied hearing the FBI identification. An FBI agent, however, testified that he heard Johnnie Oliver call out the same words testified to by Little before the grand jury. There was also FBI testimony that Guyon subsequent to his arrest stated that he knew the FBI and the police were looking for him.

Guyon took the witness stand in his own defense and testified concerning the shooting of Agent Oliver: "He shot at me and I shot at him." Guyon's bullet went through Oliver's heart and lungs, causing his death. FBI agent Stiller testified that shortly after Guyon's arrest, Guyon gave him a statement in which he "did mention that as he was bringing the weapon up to shoot Oliver, that he thought Preston must have some very heavy friends to have a white guy here after him."

As to the question of who shot first, in addition to Guyon's statement, there was testimony from two FBI agents that they heard a shot from a small calibre weapon and immediately thereafter a shotgun blast and then a number of shots following thereafter. In the light of the District Judge's charge (which we quote below), the jury in returning its first degree murder verdict obviously resolved these fact disputes in favor of the prosecution.

Appellant's brief presents four stated issues—the most important of which we will deal with last. That issue concerns the District Judge's failure to charge upon a manslaughter verdict as requested by Guyon's counsel.

Turning to the first stated issue, a claim of violation of 18 U.S.C. § 3109, it reads as follows:

### § 3109. Breaking doors or windows for entry or exit

The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

While in its exact language this provision appears to apply to the execution of search warrants, it has also been held to apply to arrest by federal officers for violation of federal law. See Sabbath v. United States, 380 F.2d 108 (9th Cir.1967), rev'd on other grounds, 391 U.S. 585, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968); United States v. Murrie, 534 F.2d 695, 697 (6th Cir.1976).

Appellant's contention is that the agents' failure to state authority and purpose before entering violated this statute and hence rendered their conduct both unlawful and unauthorized.

It is the government's claim that the exigent circumstances of this case, namely, that Guyon was known to be a fugitive from justice who was the subject of a federal fugitive arrest warrant, who knew that the FBI was looking for him and who was armed and dangerous, justified their entrance into Katherine Little's apartment by ruse and the force which was employed. The government points to the United States Supreme Court's holding in Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), where the Court recognized that exigent circumstances might excuse failure to follow the letter of § 3109, if announcement of identity and purpose prior to their entrance would unreasonably imperil the lives of the agents concerned. The government further maintains that whether or not the agents were in technical compliance with this statute, they were still engaged in the performance of their official duties, as set forth in Title 18, § 1114. See

*also Steagald v. United States,* 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

We find in the record of this case exigent circumstances which would excuse the entry as made. We also point out that there was testimony from which the jury could have concluded, as it apparently did, that the FBI agents did announce their presence and further that appellant knew who they were. We agree with plaintiff-appellee that the FBI agents who entered the Little apartment were clearly and solely in the performance of their official duties and that under the circumstances their entrance was lawful.

■ Appellant's second stated issue is that the District Judge gave a fatally erroneous charge on intent and malice. The District Judge's charge in this respect was taken from 1 DEVITT AND BLACKMAR, FEDERAL JURY PRACTICE AND INSTRUCTIONS (3d Ed. 1977) § 14.13, as follows:

Intent ordinarily may not be proved directly, because there is no way of fathoming or scrutinizing the operations of the human mind. But you may infer the defendant's intent from the surrounding circumstances. You may consider any statement made by the defendant, and all other facts and circumstances in evidence which indicate his state of mind.

You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. As I have said, it is entirely up to you to decide that facts to find from the evidence.

This charge makes clear that the jury may "infer" intent from a defendant's acts but it includes no presumption in this regard. This charge has been approved by this and other courts. *United States v. Gaines,* 594 F.2d 541 (6th Cir.), *cert. denied,* 442 U.S. 944, 99 S.Ct. 2888, 61 L.Ed.2d 314 (1979).

■ Appellant's third contention may be phrased as follows: deliberate and premeditated murder is not sufficiently shown by evidence in this record. In support of this proposition, appellant argues the evidence favorable to the defendant and largely ignores the facts favorable to the prosecution's case. These latter facts obviously persuaded the jury to its verdict and on reviewing that verdict, we are required to review the facts from the point of view favorable to the government which was accepted by the jury. *Hamling v. United States,* 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974); *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Luxenberg,* 374 F.2d 241 (6th Cir.1967).

On such a view of the evidence appellant knew he "was in trouble" and had been informed that the FBI was "looking for him." He did not contact that organization after receiving such notice. On the contrary, he armed himself and carried a loaded pistol (sometimes two). When actually confronted by the FBI, he used the pistol to escape from capture by killing an FBI agent. At his brother's house, the first place of refuge that appellant found after his escape, he told his brother's wife, "I shot the FBI." We believe these facts plus the many facts pertaining to appellant's status as a fugitive from felony warrants in two states, the evidence from several sources concerning his constant possession of weapons, demonstrated a predetermination on appellant's part to resist capture by deadly force. While the confrontation itself was doubtless a matter of seconds, appellant's preparation to resist with deadly force was equally obviously a matter of months.

■ This analysis of facts which serves as direct support for the first degree murder verdict also forms the background for our consideration of appellant's fourth issue. Appellant argues with vigor that at trial the District Judge was asked to charge upon manslaughter as an offense, included in first degree murder, which should have provided a fourth option to the jury and that his failure to grant this request requires our vacation of his sentence and a new trial. *See Stevenson v. United States,* 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896); *Kinard v. United States,* 96 F.2d 522

(D.C.1938). Cf. *Keeble v. United States,* 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973) (right to charge on lesser included offense); *Sansone v. United States,* 380 U.S. 343, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965) (same).

The federal statutes applicable to this appeal are as follows:

§ **1111. Murder**

(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of murder in the first degree, shall suffer death unless the jury qualifies its verdict by adding thereto "without capital punishment", in which event he shall be sentenced to imprisonment for life;

Whoever is guilty of murder in the second degree, shall be imprisoned for any term of years or for life. June 25, 1948, c. 645, 62 Stat. 756.

§ **1112. Manslaughter**

(a) Manslaughter is the unlawful killing of a human being without malice. It is of two kinds:

Voluntary—Upon a sudden quarrel or heat of passion.

Involuntary—In the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death.

(b) Within the special maritime and territorial jurisdiction of the United States,

Whoever is guilty of voluntary manslaughter, shall be imprisoned not more than ten years;

Whoever is guilty of involuntary manslaughter, shall be fined not more than $1,000 or imprisoned not more than three years, or both. June 25, 1948, c. 645, 62 Stat. 756.

§ **1114. Protection of officers and employees of the United States**

Whoever kills any judge of the United States, any United States Attorney, any Assistant United States Attorney, or any United States marshal or deputy marshal or person employed to assist such marshal or deputy marshal, any officer or employee of the Federal Bureau of Investigation of the Department of Justice, * * * while engaged in the performance of his official duties, or on account of the performance of his official duties, shall be punished as provided under sections 1111 and 1112 of this title. June 25, 1948, c. 645, 62 Stat. 756; May 24, 1949, c. 139, § 24, 63 Stat. 93; Oct. 31, 1951, c. 655, § 28, 65 Stat. 721; June 27, 1952, c. 477, Title IV, § 402(c), 66 Stat. 276; July 29, 1958, Pub.L. 85–568, Title III, § 304(d), 72 Stat. 434; July 2, 1962, Pub.L. 87–518, § 10, 76 Stat. 132; Aug. 27, 1964, Pub.L. 88–493, § 3, 78 Stat. 610; July 15, 1965, Pub.L. 89–74, § 8(b), 79 Stat. 234.

The District Judge, of course, charged on first degree murder and its requirement of premeditation. He also charged upon second degree murder, telling the jury that in order to render that verdict, it must find intentional killing with malice which did not involve the key element of premeditation. His charge was some seventy pages in length, and as we see it, fully informed the jury of its right to return one of three verdicts: guilty of murder in the first degree, guilty of murder in the second degree and not guilty.

Where the jury, with these choices before it, chose a first degree murder verdict rather than a verdict of murder in the second degree, it had first to decide that on the facts before it, the killing was premeditated. This jury verdict must be read as re-

jecting a second degree murder verdict. Moreover, that determination would, even more conclusively, have prevented the jury from returning a manslaughter verdict.

Appellant's actual defense at this trial, however, was not that he was guilty of manslaughter rather than of murder, it was that on the date in question he did not commit any crime. His testimony was that he was acting in self defense, as he had a right to do, in resisting an attack by armed men whom he believed had been recruited by Preston Mathis, his rival for Katherine Little's affections. His testimony at trial clearly presented this theory to the jury. The trial judge's full and complete charge on self defense was as follows:

"If you find that the Government has proved beyond a reasonable doubt the first two essential elements of the offense of first degree murder, that the defendant acted unlawfully and with malice aforethought, but that the Government has not proved beyond a reasonable doubt the third essential element, that the defendant acted with premeditation, then you must find him guilty of the lesser included offense of second degree murder. On the other hand, if you find that the Government has not proved beyond a reasonable doubt either or both of the first two essential elements, then you must find the defendant not guilty of second degree murder.

If it is shown that the defendant used a deadly weapon in the commission of a homicide, then you may find, from the use of such weapon, in the absence of explanatory or mitigating circumstances, the existence of the malice which is an essential element of the offense. You are not obliged so to find, however. You may not find the defendant guilty unless you are satisfied that the Government has established every essential element of the offense, as explained in this charge, beyond reasonable doubt.

A gun, as a matter of law, is a deadly weapon.

If the defendant was not the aggressor, and had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant, he had the right to employ deadly force in order to defend himself. By 'deadly force' is meant force which is likely to cause death or serious bodily harm.

In order for the defendant to have been justified in the use of deadly force in self-defense, he must not have provoked the assault on him or have been the aggressor. Mere words without more, do not constitute provocation or aggression.

The circumstances under which he acted must have been such as to produce in the mind of a reasonably prudent person, similarly situated, the reasonable belief that the other person was then about to kill him or to do him serious bodily harm. In addition, the defendant must have actually believed that he was in imminent danger of death or serious bodily harm and that deadly force must be used to repel it.

To determine if a defendant believes he was in imminent danger and had reasonable grounds to believe he was, you should put yourself in the place of the defendant. Consider the conduct of Johnnie Oliver and determine if what he did caused the defendant to reasonably and honestly believe he was about to be killed or to receive great bodily harm.

If evidence of self-defense is present, the Government must prove beyond a reasonable doubt that the defendant did not act in self-defense. If you find that the Government has failed to prove beyond a reasonable doubt that the defendant did not act in self-defense, you must find the defendant not guilty. In other words, if you have a reasonable doubt whether or not the defendant acted in self-defense, your verdict must be not guilty as to both first degree murder and the lesser included offense of second degree murder.

If the defendant had reasonable grounds to believe that he was in imminent danger of death or serious bodily harm and that deadly force was necessary to repel such danger, he would be justified in using deadly force in self-defense, even though it may

afterwards have turned out that the appearances were false. If these requirements are met he could use deadly force even though there was in fact neither purpose on the part of the other person to kill him or do him serious bodily harm, nor imminent danger that it would be done, nor actual necessity that deadly force be used in self-defense.

If the defendant had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm and that deadly force was necessary to repel such danger, he was not required to retreat or to consider whether he could safely retreat. He was entitled to stand his ground and use such force as was reasonably necessary under the circumstances to save his life or protect himself from serious bodily harm.

However, if the defendant could have safely retreated but did not do so, his failure to retreat is a circumstance which you may consider, together with all other circumstances, in determining whether he went farther in repelling the danger, real or apparent, than he was justified in doing under the circumstances.

Even if the other person was the aggressor and the defendant was justified in using force in self-defense, he would not be entitled to use any greater force than he had reasonable grounds to believe and actually did believe to be necessary under the circumstances to save his life or avert serious bodily harm.

In determining whether the defendant used excessive force in defending himself, you may consider all the circumstances under which he acted. The claim of self-defense is not necessarily defeated if greater force than would have seemed necessary in cold blood was used by the defendant in the heat of passion generated by an assault upon him. A belief which may be unreasonable in cold blood may be actually and reasonably entertained in the heat of passion.

You must distinguish resisting arrest from self-defense. If you find that the Government has proved beyond a reasonable doubt that the defendant knew before he acted that Johnnie Oliver was a law-enforcement officer who intended to arrest him and that the defendant acted to avoid arrest, you may not acquit the defendant by reason of self-defense.

You must, therefore, consider whether Johnnie L. Oliver and the other FBI agents caused the defendant to reasonably and honestly believe that he was about to be killed or receive great bodily harm, or if their conduct caused him to believe that he was about to be arrested according to lawful means.

As I previously instructed you, if evidence of self-defense is present, the Government must prove by evidence beyond a reasonable doubt that the defendant did not act in self-defense.

There is nothing peculiarly different in the way a jury should consider the evidence in a criminal case from that in which all reasonable persons treat any question depending upon evidence presented to them. You are expected to use your good sense to consider the evidence in the case for only those purposes for which it has been admitted, and give it a reasonable and fair construction, in the light of your common knowledge of the natural tendencies and inclinations of human beings.

If the accused be proved guilty beyond a reasonable doubt, say so. If not so proved guilty, say so.

Keep constantly in mind that it would be a violation of your sworn and solemn duty to base a verdict of guilty upon anything other than the evidence in the case; and remember as well that the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence."

This charge clearly gave the jury the right and the duty to find him, Guyon, not guilty if the members of the jury believed him.

The jury, however, plainly did not believe appellant's story. The jury's first degree murder verdict must be read as a jury

finding of premeditation and malice and a rejection of any "heat of passion" theory.

While what has been said above we believe responds to appellant's first three stated issues, we have not spoken the final word on appellant's fourth argument which he phrases:

> In a murder prosecution, where there is evidence which, if believed by the jury, would reduce the crime to manslaughter, an instruction defining that crime must be given to the jury—particularly if requested. . . .

In dealing with this issue, we, of course, are not privileged to choose between disputed issues of fact on the basis of testimony which we regard as convincing nor may we rely on deductions from the jury's verdict since it is appellant's contention that the jury should have had (but didn't) the choice of a manslaughter verdict. Indeed, there are Supreme Court cases treating charges of felonious killing which seem to favor inclusion in the judge's instructions of any lesser arguably included offense as a permissible verdict under a proper charge. In *Keeble v. United States,* 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973), the Court held that an Indian convicted of assault with intent to commit serious bodily injury on an Indian reservation was entitled to a new trial because the trial court had refused to instruct the jury on the lesser included offense of simple assault.

In the majority opinion Mr. Justice Brennan said:

> Although the lesser included offense doctrine developed at common law to assist the prosecution in cases where the evidence failed to establish some element of the offense originally charged,[5] it is now beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater. The Federal Rules of Criminal Procedure deal with lesser included offenses, see Rule 31(c),[6] and the defendant's right to such an instruction has been recognized in numerous decisions of this

Court. See, *e.g., Sansone v. United States,* 380 U.S. 343, 349, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965); *Berra v. United States,* 351 U.S. 131, 134, 76 S.Ct. 685, 687, 100 L.Ed. 1013 (1956); *Stevenson v. United States,* 162 U.S. 313, 16 S.Ct. 839, 40 L.Ed. 980 (1896).[7]

In defending the trial court's refusal to offer the requested instruction, the Government does not dispute this general proposition, nor does it argue that a lesser offense instruction was incompatible with the evidence presented at trial. Cf. *Sansone v. United States, supra; Sparf v. United States,* 156 U.S. 51, 63–64, 15 S.Ct. 273, 277–279, 39 L.Ed. 343 (1895). On the contrary, the Government explicitly concedes that any non-Indian who had committed this same act on this same reservation and requested this same instruction would have been entitled to the jury charge that petitioner was refused.

[5] See *Kelly v. United States,* 125 U.S.App. D.C. 205, 207, 370 F.2d 227, 229 (1966); *United States v. Markis,* 352 F.2d 860, 866 (CA2 1965); 2 C. Wright, Federal Practice and Procedure—Criminal § 515, p. 372 (1969).

[6] Rule 31(c) provides that "[t]he defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense." The rule codified pre-existing law, in particular former § 565 of Tit. 18, Act of June 1, 1982, § 9, 17 Stat. 198. See *Berra v. United States,* 351 U.S. 131, 134 and n. 6, 76 S.Ct. 685, 688 and n. 6, 100 L.Ed. 1013 (1956).

[7] See also, *e.g., Government of Virgin Islands v. Carmona,* 422 F.2d 95, 100 (CA3 1970); *United States v. Comer,* 137 U.S.App.D.C. 214, 218, 421 F.2d 1149, 1153 (1970).

We find it difficult to say that Guyon's claim that he killed agent Oliver because he mistook him for someone recruited by Mathis in Mathis' pursuance of their quarrel can be disregarded as a matter of law. The arguably applicable statutory definition of manslaughter is that of "voluntary" manslaughter. This is defined in the statute (§ 1112) as "upon a sudden quarrel or heat of passion." Under the facts of this case "heat of passion" could include the passion of fear. We recognize, as pointed out above, that Guyon claims he was con-

fronted by a sudden assault which he believed was in pursuance of Mathis' private quarrel with him over Katherine Little. Under this circumstance, we believe the District Judge would have been well advised to have charged on the crime of manslaughter.

Before concluding, however, that what we have said above necessarily means a remand for a new trial in this case, we must consider the government's contention that if there was error, it was "harmless beyond a reasonable doubt" under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See also Krzeminski v. Perini,* 614 F.2d 121 (6th Cir.1980).

The facts to which we have previously referred, namely, the multiplicity of criminal charges pending against Guyon in Ohio and Illinois, his flight from the Ohio charges to Illinois, and his subsequent flight from Illinois to Ohio, his constantly going armed, his failure to surrender to the FBI summonses, his statement to his brother's wife at the first point of refuge that he reached after he killed Oliver, "I shot the FBI and he shot at me," plus the fact that Oliver was engaged solely in the performance of his sworn duty all serve to convince this court that this case is a proper candidate for decision under the harmless error rule.

On May 23, 1983, the Supreme Court of the United States again revisited the harmless error rule saying:

> Since *Chapman,* the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations, see, *e.g., Brown [v. United States], supra,* 411 U.S. [223] at 230–232 [93 S.Ct. 1565 at 1569–1570, 36 L.Ed.2d 208 (1973)]; *Harrington v. California,* 395 U.S. 250 [89 S.Ct. 1726, 23 L.Ed.2d 284] (1969); *Milton v. Wainwright,* 407 U.S. 371 [92 S.Ct. 2174, 33 L.Ed.2d 1] (1972).

*United States v. Hastings,* —— U.S. ——, ——, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983).

We are acutely conscious of the anomaly of employing the harmless error rule to affirm a conviction which has resulted in a life sentence. We employ that rule only because we are satisfied beyond a reasonable doubt that this case might be repeatedly retried with the manslaughter option available to the jury without a manslaughter verdict ever resulting. We do not think any jury would ignore appellant's culpability in occasioning the fatal confrontation or his preparation for the resulting lethal exchange.

## THE DISSENT

The dissent in this case quotes a great deal of undisputed law in order to reiterate the conclusion previously reached by the majority that "the District Judge would have been well advised to have charged on the crime of manslaughter." It does not respond at all effectively to the government's alternative claim and the majority opinion result that if the omission of a manslaughter charge was error under the facts of this case, the error was harmless "beyond reasonable doubt" under the doctrine of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The dissent really represents an argument that in any criminal case failure to charge upon any and all conceivably included offenses represents *reversible* error as a matter of law, and thus that the reviewing court cannot consider the *Chapman* doctrine. As we have pointed out above, however, the Supreme Court has very recently instructed again "it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations." *United States v. Hastings,* —— U.S. ——, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983).

It may well be that the *Chapman* doctrine does create contradictions in legal theory by requiring the courts to define error and yet not always reward such a finding with a new trial. The *Chapman* and *Hastings* cases, however, require a quite practi-

cal consideration of when a new trial may be ordered.

We do not think any jury would ignore appellant's culpability in occasioning this fatal confrontation. The uncontroverted record of appellant's flight from five felony charges in two states, his long-standing preparation for armed resistance to arrest, his failure to respond to the FBI's repeated warnings to him to surrender are in our judgment undisputed facts which would prevent any jury from finding this killing was unpremeditated and without malice.

We agree with the dissent that absent the failure to charge on manslaughter "the trial judge conducted a very careful and fair trial"; but we also hold that any error in this record was of a technical nature and harmless beyond reasonable doubt.

The judgment of the District Court is affirmed.

NATHANIEL R. JONES, Circuit Judge, dissenting.

To hold that the district court's failure to proffer a lesser-included offense instruction was "error" and to then hold that such error was "harmless" represents, given the nature of the analysis required, a gross contradiction in terms. I must, therefore, dissent from the majority's resolution of what it admits is "the most substantial issue" raised in this appeal.[1]

It has long been "beyond dispute that the defendant is entitled to an instruction on a lesser-included offense if the evidence would permit a jury rationally to find him guilty of a lesser offense and acquit him of the greater."[2] *Keeble v. United States,* 412 U.S. 205, 208, 93 S.Ct. 1993, 1995, 36 L.Ed.2d 844 (1973). *See also Hopper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049, 2052, 72 L.Ed.2d 367 (1982); *Beck v. Alabama,* 447 U.S. 625, 635, 100 S.Ct. 2382, 2388, 65 L.Ed.2d 392 (1980); *Sansone v. United States,* 380 U.S. 343, 349, 85 S.Ct. 1004, 1009, 13 L.Ed.2d 882 (1965). Two inquiries must be made in order to determine whether a lesser-included offense instruction should be given: (1) Does the greater offense require proof of a disputed factual element not required to be proved in the lesser-included offense? *Sansone v. United States,* 380 U.S. at 349–50, 85 S.Ct. at 1009–1010; (2) Is there evidence in the trial which, if believed, would permit a jury to rationally convict the defendant on the lesser charge? *Id.; see also Hopper v. Evans,* 101 S.Ct. at 2052. An examination of the instant case clearly reveals that both of these elements are satisfied.

In order to prove murder, as defined in 18 U.S.C. § 1111, the prosecution must establish four elements: (1) a homicide, (2) malice aforethought, (3) premeditation and/or deliberation, and (4) intent. The proof required for a conviction for second-degree murder differs from the above in that it does not require a finding of premeditation. *Beardslee v. United States,* 387 F.2d 280, 292 (8th Cir.1967). Voluntary manslaugh-

---

1. The majority characterizes the record evidence surrounding the fatal confrontation as "undisputed," particularly noting what it calls "the FBI's repeated warnings." My reading of the record does not permit me to reach such a conclusion. Guyon's fugitive status, for whatever period of time, is irrelevant to his mental state at the moment of confrontation. Such a status does not preclude him from receiving a proper instruction on included offenses where the record shows, as it does here, that a jury *could* have believed Guyon's contention that in an instant of acute fear he thought the agents were in fact a squad of thugs out to kill him.

2. It is unclear to what extent this entitlement stems from due process requirements. In *Keeble v. United States,* 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973), the Court found that it was reversible error for the lower court to refuse a lesser-included offense instruction on the facts presented. While the Court did note that such a failure raised difficult constitutional questions, it did not explicitly hold that due process guaranteed the right to the included offense instruction.

In *Beck v. Alabama,* 447 U.S. 625, 635, 100 S.Ct. 2382, 2388, 65 L.Ed.2d 392 (1980), the Court did, however, hold that due process at least guarantees such an instruction, where warranted, in a capital case. The only Supreme Court case addressing the issue since, *Hopper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), reiterated the principle in *Beck,* but still refused to extend it to noncapital cases since the facts did not require such an extension.

ter, defined in 18 U.S.C. § 1112, is an unlawful intentional killing committed *without* malice aforethought, while in the sudden heat of passion due to adequate provocation. As can be gleaned from these definitions, the difference between murder and manslaughter is the existence of malice, express or implied. The charged offense in the present case requires the jury to find all of the elements of manslaughter *plus* the additional element of malice. This clearly satisfies the first prong of the test articulated in *Sansone.*

The second requirement embodies the recognition that a defendant is not entitled to a lesser offense charge merely because he contests those elements of the greater offense which distinguish it from the lesser. Rather, there must be sufficient evidence presented at trial to justify a reasonable juror's conclusion that the defendant committed the lesser, and not the greater, offense. *Hopper v. Evans, supra; Beck v. Alabama,* 447 U.S. at 637, 100 S.Ct. at 2389. *See also United States v. Basil,* 592 F.2d 513, 525 (2d Cir.1978). In this case, then, Guyon was entitled to a lesser-included offense instruction if, and only if, from the evidence presented, a rational juror could have concluded that he acted without malice in killing the FBI agent.

The nature of the analysis required in determining whether and when this requirement is satisfied was first set out in *Stevenson v. United States,* 162 U.S. 313, 323, 16 S.Ct. 839, 842, 40 L.Ed. 980 (1896):

A judge may be entirely satisfied from the whole evidence in the case that the person doing the killing was not in any such passion as to lower the grade of the crime from murder to manslaughter by reason of any absence of malice; and yet *if there be any evidence fairly tending to bear upon the issue* of manslaughter, it is the province of the jury to determine from all the evidence what the condition of mind was, and to say whether the crime was murder or manslaughter.

The Supreme Court has adhered to this analysis; *see Keeble v. United States,* 412 U.S. 205, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973); *Beck v. Alabama, supra,* as have most of the lower courts considering the issue. *See e.g. People of the Territory of Guam v. Fejeran,* 687 F.2d 302 (9th Cir. 1982); *United States v. Lincoln,* 630 F.2d 1313, 1320 (8th Cir.1980); *Strauss v. United States,* 376 F.2d 416 (5th Cir.1967). In *Strauss,* the Fifth Circuit explained the trial court's role as follows:

We find no requirement that a requested charge encompass in the trial judge's eyes, a believable or sensible defense. The judge is the law-giver. He decides whether the facts constituting the defense framed by the jury are legally sufficient to render the accused innocent. The jury is the factfinder. If the trial judge valuates or screens the evidence supporting a proposed defense, and upon such evaluation declines to charge on that defense, he dilutes the defendant's jury trial by removing the issue from the jury's consideration. In effect, the trial judge directs a verdict on that issue against the defendant. This is impermissible.

\* \* \* \* \* \*

The jury did not have to believe the defenses but it should have been given the opportunity. This is true even if the defense is fragile. A defendant cannot be short changed nor his jury trial truncated by a failure to charge.

*Id.* at 419. Most recently, in *Hopper v. Evans, supra,* the Supreme Court emphasized that, in the context of this inquiry, the evidence presented by the defendant is to be taken as true. The Court indicated that a lesser-included offense instruction is appropriate in circumstances "when there [is] evidence which, *if believed,* could reasonably have led to a verdict of guilt of a lesser offense." 102 S.Ct. at 2052 (emphasis added).

Viewed under this standard, the evidence presented at trial clearly demonstrated that: (1) prior to the actual homicide, there was "bad blood" between the defendant and Preston Mathis; (2) the defendant, just prior to the FBI's entrance into the apartment, viewed Mathis through the peep hole; (3)

after the "break-in" there was a great deal of noise and commotion; and (4) prior to shooting agent Oliver, the defendant purportedly thought "Preston [Mathis] must have some heavy friends to have a white guy come up here with a pump shotgun." Under such circumstances, a reasonable juror could have found that the defendant was acting out of fear. As the majority notes, the requisite heat of passion for manslaughter may be produced by fear as well as by rage. *See Kinard v. United States,* 96 F.2d 522, 526 (D.C.Cir.1938).

Though the majority opinion is rather vague, the first paragraph on page sixteen seems to amount to a finding that the trial court did err in failing to proffer the requested manslaughter instruction. The Court finds it "difficult to say that Guyon's claim that he killed agent Oliver because he mistook him for someone recruited by Mathis in Mathis' pursuance of their quarrel can be disregarded as a matter of law," then recognizes that heat of passion can include fear and that the testimony of Guyon and Little raise the possibility of such fear, and, finally, concludes that the trial judge "would have been well advised to have charged on the crime of manslaughter." This progression, and the majority's reference to *Keeble v. United States, supra,* indicates a recognition of the test and standards set out above and an admission that both prongs of *Sansone* are easily satisfied on the facts of this case.

The majority concludes, however, that the trial court's error in failing to give the requested manslaughter instruction was "harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)." The majority bases this conclusion on several arguments: (1) the evidence is otherwise sufficient to support the conclusion that Guyon committed first-degree murder; (2) the jury's refusal to acquit on the basis of self-defense should be read as a "finding" of premeditation and malice, and an implicit rejection of a "heat of passion theory;" and (3) the jury's refusal to return a second-degree murder verdict represents a rejection of all defenses raised and would "have prevented the jury from returning a manslaughter verdict." All three arguments are wholly without merit.

The majority does not cite, nor could I locate, any case discussing the propriety of a lesser-included offense charge in which, once it concluded that such a charge would be appropriate, the court proceeded to find that the error was *harmless* under a *Chapman* analysis. Rather, a *Chapman*-type evaluation of the evidence and/or of the prejudice inuring to the defendant, should occur *fully* during an analysis of the second element of *Sansone,* obviating the need to go further. Thus, even conceding that a *Chapman* analysis would be technically appropriate once a *Sansone* analysis were complete, I believe that a court employing the two could rarely justify reaching contrary results. I find this to be particularly true where the finding of harmless error is predicated on an evaluation of the weight of the evidence; the end result could not help but be a self contradiction.

The *Chapman* standard simply does not significantly differ from that required under *Sansone.* Under *Chapman* and *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), an appellate court is not to find an error harmless unless it is satisfied that it is "harmless beyond a reasonable doubt." Such a finding is only justified where there is no "reasonable possibility" that the error affected the jury's verdict. *Chapman,* 386 U.S. at 23–24, 87 S.Ct. at 827–828. *See also Kampshoff v. Smith,* 698 F.2d 581 (2d Cir.1983). A conclusion that the evidence at trial "could reasonably have led to a verdict of guilt of a lesser offense," *Hopper v. Evans,* 102 S.Ct. at 2052, would appear, therefore, to foreclose a finding that there was no "reasonable possibility" that the jury verdict was affected by the failure to tender the lesser-included offense instruction. The majority's assertion that the presence of certain contrary evidence "convinces" it "that this case is a proper candidate for decision under the harmless error rule," is simply insufficient. The questions of harmless error and sufficiency of the evidence

are *not* coterminous. *Kampshoff v. Smith, supra.* The Supreme Court itself admonished against giving undue weight to even overwhelming evidence of guilt, stating that errors affecting the substantial rights of defendants cannot be considered harmless. *Harrington v. California,* 385 U.S. at 254, 89 S.Ct. at 1728, citing *Chapman,* 386 U.S. at 23, 87 S.Ct. at 827.

The similarity between the *Sansone* and *Chapman* standards is emphasized by the majority's own reference to *Krzeminski v. Perini,* 614 F.2d 121 (6th Cir.1980), in support of its application of the harmless error standard in this Circuit. There, the district court instructed the jury that they were to presume that a killing had been unlawful. On appeal, the defendant claimed that this impermissibly negated a key defense—i.e. any claim that the killing had been *lawful.* The error was deemed harmless in light of the evidence attributable to the defendant himself: he had, on numerous occasions, admitted to the murder of his wife. In addition, he at no time claimed that the killing was not unlawful, his only claim was that he should be found not guilty of an otherwise unlawful offense by reason of his insanity. Similarly, the only case in which the Supreme Court has found that a lesser-included offense instruction was not required once the first prong of *Sansone* had been met was one in which the defendant's own testimony *affirmatively negated* his claim that the killing with which he was charged was unintentional. *Hopper v. Evans, supra.* The analysis, paralleling this Court's in *Krzeminski,* was conducted solely to determine whether the evidence justified the giving of the lesser-included offense instruction in the first instance.

It appears, therefore, that the majority's two conclusions—that error occurred and that the error was harmless—represent wholly inconsistent evaluations of the evidence and of the prejudice to the defendant. In fact, Justice Brennan's opinion in *Keeble v. United States, supra,* clearly indicates that once a court concludes that the jury could rationally have found the defendant guilty of the lesser, rather than the greater offense, the inquiry should be at an end, and reversal required. He wrote:

> Moreover, it is no answer to petitioner's demand for a jury instruction on the lesser offense to argue a defendant may be better off without such instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction—in this context or any other—precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction. In the case before us, for example, an intent to commit serious bodily injury is a necessary element of the crime with which petitioner was charged, but not of the crime of simple assault. Since the nature of petitioner's intent was very much in dispute at trial, the jury could rationally have convicted him of simple assault if that option had been presented. But the jury was presented with only two options: convicting the defendant of assault to commit great bodily injury, or acquitting him outright. *We cannot say that the availability of the third option—convicting the defendant of simple assault—could not have resulted in a different verdict.*

*Id.* at 212–13, 93 S.Ct. at 1997–98 (emphasis added).[3]

The majority's alternative grounds for finding the error acceptable similarly miss the mark. First, the assertion that the jury's failure to accept the self-defense

---

**3.** This rationale is in accord with the Court's holding in *United States v. Blane,* 375 F.2d 249, 252 (6th Cir.1967), where we remarked:

> In a criminal case, it is reversible error for a trial judge to refuse to present adequately a defendant's theory of defense, especially where a proper request therefor is proffered.

claim is to be read as a finding of malice ignores the substance of the very instruction quoted at length in the majority opinion. The jury was carefully instructed on the elements needed to establish the complete defense of self-defense. They were told simply that if they found that all the requisite elements had been established, they must find that the defendant was *not guilty* of any crime. Nowhere was the absence of malice presented as an element of the defense and, more pointedly, nowhere was the absence of the elements of self-defense equated with the presence of malice. The jury's rejection of the defense, as set out in the court's charge, simply cannot be interpreted as an implicit finding of malice. There is no basis in logic for the majority's interpretation of this aspect of the jury verdict.

Moreover, whenever a claim of self-defense is presented, the defendant's possible motives and mental attitudes toward the victim are especially important. *See Wakaksan v. United States,* 367 F.2d 639, 645–46 (8th Cir.1966). This is particularly true where a defendant honestly, yet unreasonably, believes that he is in imminent danger of harm. In such cases, though the claim of self-defense may be imperfect, the honest apprehension of harm may be sufficient to mitigate the resultant crime, reducing it from murder to voluntary manslaughter. *Cf. United States Ex Rel Crosby v. Brierley,* 404 F.2d 790, 797 n. 17 (3rd Cir.1968). In the present case the jury was clearly instructed that the defendant's self-defense claim must be rejected if they found that his fear of harm was unreasonable. They were not, however, given the option of finding that the fear, though unreasonable, was sufficient to justify an alternate, less complete defense—i.e. that the killing was committed in a heat of passion caused by that fear and, thus, lacked malice. This is precisely the kind of limitation on the jury's options which the Supreme Court found impermissible in *Keeble* and *Beck.*

The majority's emphasis on the fact that the jury returned a first-degree murder charge, when given the option to find the defendant guilty of second-degree murder,

also lends no support to the conclusion that the error was harmless. Any emphasis on the finding of premeditation is essentially a red herring. The proper place for emphasis in the present case is on the distinction between murder and manslaughter—i.e. whether the defendant acted with malice aforethought. The defendant claims that though his conduct may have appeared sufficiently willful to prompt a juror faced only with the options of first-degree murder, second-degree murder and acquittal to choose the first, his actions were actually taken *without malice.* Where the presence or absence of malice is the issue, second-degree murder is no "closer" to manslaughter than is first-degree murder and the failure to present a fourth option to the jury, voluntary manslaughter, deprives the defendant of a defense based on the lack of malice and of the right to be protected from arbitrary decisionmaking by the jury. *Keeble, supra.*

In *Stevenson v. United States, supra,* the Supreme Court addressed this precise distinction and concluded that it was reversible error to refuse to submit the malice issue to the jury with proper instructions. Following a quarrel with a deputy United States Marshal named Gaines, Stevenson entered a saloon armed with a shotgun. Gaines fired a shot through the door blindly, missing Stevenson. Stevenson fired back, killing Gaines. The trial court instructed the jury on murder and self-defense, but not on manslaughter. The Supreme Court found that the evidence raised a question of fact as to whether "the effect of the conduct of the deceased . . . was such as naturally tended to and did excite in the mind of the plaintiff in error sudden passion, either of rage or fear, and under the influence of which he fired and shot and killed the deceased willfully and unlawfully, but at the same time without malice." 162 U.S. at 320, 16 S.Ct. at 841. *See also People of the Territory of Guam v. Fejeran,* 687 F.2d at 306.

In *Fejeran,* an officer was killed following a struggle over a gun and a shoot-out. Though the defendant possessed a gun and pointed it at another officer as a threat, he

testified that he was "scared" when firing the fatal shot. The district court refused to tender a manslaughter instruction. The circuit court analyzed the rationale of *Stevenson* and concluded as follows:

> We may be satisfied on the whole evidence, as was the trial judge, that Fejeran did not shoot the officers "under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse;" in light of *Stevenson,* however, we cannot say a rational jury could not reach the opposite conclusion. The question was one of fact to be submitted to the jury under proper instructions.

*Id.* at 306 (citations omitted).

It is obvious that the key issue in the present case, the one the majority fails to address in its harmless error analysis, is whether or not a rational juror could have concluded, under the proper instructions, that the defendant acted without malice— *not* whether the jury could or did find premeditation. The majority's approach ignores the basic common law distinction now embodied in 18 U.S.C. §§ 1111 and 1112, between murder and manslaughter, the true basis of the appellant's argument and the clear mandates of *Stevenson* and its progeny.

I recognize that this case is a difficult one to grapple with. I am deeply troubled by the fact that an FBI agent was killed and am mindful of the violent path the appellant has walked. I am also aware that, but for the fatal flaw I have addressed here, the trial judge conducted a very careful and fair trial. It is precisely in such cases, however, that we must be cautious not to let our outrage propel us into overlooking errors affecting a defendant's substantial rights, or to countenance the cutting of corners. What is at stake is the defendant's right to an informed jury verdict. The jury's verdict here cannot be said to have been informed. I respectfully dissent.